No. 85-035

IN THE SUPREME COURT OF THE STATE OF MONTANA

1985

PAT WILKERSON,

        Plaintiff and Appellant,

  -vs-

SCHOOL DISTRICT NO. 15,
GLACIER COUNTY, MONTANA,

        Defendant and Respondent.

APPEAL FROM: District Court of the Ninth Judicial District,
In and for the County of Glacier,
The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Hartelius & Ferguson; Cameron Ferguson, Great Falls,
Montana

    For Respondent:

        Werner, Nelson & Epstein
        James C. Nelson, ~~Glacier County Attorney,~~ Cut Bank,
Montana

Submitted on Briefs: March 28, 1985

Decided: May 23, 1985

Filed: MAY 23 1985

*Ethel M. Harrison*
_____
Clerk

Mr. Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Pat Wilkerson appeals an order of the Glacier County District Court which granted the School District's motion for a judgment notwithstanding the verdict, after a jury had returned its verdict in favor of Wilkerson. Wilkerson sought to enforce a contract of employment with the School District. Three issues are presented for review: first, whether the oral conversation made prior to the parties' written contract had any effect on the terms of that contract; second, whether that oral conversation constituted a condition precedent; and third, if so, whether Wilkerson's failure to satisfy that condition precedent breached the contract.

We reverse and remand for reinstatement of the jury verdict.

On August 23, 1983, Pat Wilkerson, a 31-year-old divorced mother of three children, applied to the Glacier County School District 15, for a job as a full-time bus driver. On that date, she and members of the school board signed a written document entitled "Cut Bank Public Schools Bus Driver's Contract." At the time she applied for the job, she was working nights as a bartender in Cut Bank, Montana. That was a fact known to Ray Milhoan, the bus driver supervisor for the School District, and was a matter both he and Wilkerson discussed prior to entering into the contract of employment. Wilkerson says Milhoan agreed she could continue to tend bar until her first paycheck from the School District arrived. But Milhoan contends she agreed to quit the bartending job prior to accepting the job with the School District. That dispute is at the heart of the controversy.

Wilkerson testified without objection, that after she had passed both the driving test and physical examination for the position, Milhoan told her he was hiring her for the job "because I feel that God is guiding me to give it to you because I don't feel a Christian should be working in a bar."

Her first day of driving the school bus was August 29, 1983. On September 15, 1983, two conversations took place between Wilkerson and Milhoan, discussing the fact that she was still working as a bartender at night and driving the bus during the daytime.

When questioned by her own counsel, about those conversations, she stated:

"A. . . . I was delivering the kids and was still on the outside of town and he called me on the radio and said, 'When you put the bus in the barn I want to see you in my office,' and I said, 'Yes, sir.' So I parked my bus and went in to see him and he said to me, 'You're still working in the bar,' and I said, 'Well, yes, I am.' He said, 'You've got a choice to make. You either want to tend bar or drive bus, but you can't do both.' And I said, 'Ray, you know that you already discussed that and agreed that I could work until after the 20th of September and until I had a bus check to live on.' He said, 'You've got a choice to make, and you make it now.' He said, 'I want your answer today.'

"Q. Then what happened? A. I said, 'I was going to quit.' He said, 'Do you mean you are not going to quit now?' and I said, 'No.' I said, 'I would have quit on my own after I was financially able to do so.'

"Q. Referring to the time when you would have received a bus check? A. Yes.

"Q. What happened then? A. He said, 'You either quit the bar or I'm going to have to fire you.' I said, 'On what grounds?' He said, 'Because you are a bartender.' I said, 'No, I won't make a decision on an ultimatum,' and he said, 'Well, I have no alternative but to fire you.'

"Q. Then what happened? A. I went home and then I came back in the afternoon and pulled my bus out of the barn at three o'clock in the afternoon, and he jumped on the bus and said, 'What's your answer?' I said, 'Ray, there's no answer.' Then

- 3 -

he said, 'Then I have to fire you.' I said, 'All right, what's your reason for firing me?' He said, 'Because you're a bartender.' I said, "Effective when?' He said, 'Effective immediately.'

"Q. Why do you feel he fired you? A. My own personal feeling?

"Q. Yes, your own feeling. A. Because he is the minister of the church and the church takes a very strong stand against alcohol and tobacco and drugs, and the use and sale of them.

"Q. And you feel that was his reason because you were working as a bartender? A. Yes."

Wilkerson testified she told Milhoan that she wanted to drive a bus, that she did not want to work in a bar, and that as soon as she was financially able, she would quit the bartending job. She said there was no way she could afford to quit before September 20, 1983, because that is the only day during the month when the School District pays its employees.

Our review of the record suggests that the particular language exchanged between Wilkerson and Milhoan gave rise to this controversy. The foregoing discussion does not establish as a matter of law that Wilkerson refused to quit her bartending job. It is reasonable that the School District took the position that: "Do you mean you're not going to quit now?," to which she answered "No," meant she determined at that point that she was not going to quit at any time. But the use of the word "now" is equally susceptible of another interpretation. Wilkerson could have meant she was not going to quit now, right this minute; that she intended to keep both jobs for five more days, until September 20, just as she and Milhoan had previously agreed.

When questioned on cross-examination, she was asked whether she recalled answering opposing counsel's questions,

- 4 -

put to her in a January 6, 1984 deposition. She indicated she did recall that situation. The exchange was as follows:

"Q. Miss Wilkerson, when you gave your deposition did I ask you this question?"

"'When you were terminated did you tell him that you only needed to work until after the first check and that then you would quit bartending?'

"A. Yes.

"Q. Did you give the following answer?:

"'I told him, "Ray, you agreed with me when you hired me that I could continue work, and that there was no way I could quit until after the 20th." That's when he made the ultimatum and said, "Well, Chris says you've got to answer now."' A. Yes." [Chris Mattocks was Superintendent of the School District.]

During the trial, Wilkerson's counsel moved to admit the parties' written contract into evidence. Opposing counsel did not object to its admission, but only on the condition that the School District be allowed to preserve its position that the document was not a legal contract.

At the close of argument, the School District moved for a directed verdict. That motion was denied, and the matter was submitted to the jury. The jury returned a verdict for Wilkerson, awarding her monetary damages of $3,500.00 for the amount due her on the remainder of the 1983-1984 school bus driver contract, less amounts earned at other employments during that period. After hearing the verdict, the School District moved for a judgment notwithstanding the verdict, and the District Court granted it.

The foregoing language between Wilkerson and Milhoan is a typical example of potentially conflicting testimony particularly appropriate for jury resolution. If there is conflicting evidence in the record, the credibility and weight given to such conflicting evidence is the province of

- 5 -

the jury and not of this Court. And if there is substantial evidence to support the finding of the jury, then the directed verdict should have been denied. Lackey v. Wilson (Mont. 1983), 668 P.2d 1051, 1053, 40 St.Rep. 1439, 1441.

The first issue presented is whether the discussion between Wilkerson and Milhoan, which took place before the contract was entered into, should be seen to vary the terms of that contract. As a general rule, § 28-2-904, MCA, provides:

> "Effect of written contract on oral agreements. The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

Section 28-2-905(1)(b), MCA, allows for an exception, namely, when the validity of the agreement is the fact in dispute. The School District takes the position that the contract is invalid because there was no meeting of the minds. It asserts the parties intended all along that Wilkerson would have only one job--that of bus driver. Wilkerson, on the other hand, points out that she made it very clear to Milhoan that while she intended to quit the bartending job, she informed him that she could not afford to do so until September 20, 1983--the day on which the School District would issue her first paycheck. The School District cites Smith v. Fergus County (1934), 98 Mont. 377, 39 P.2d 193, wherein it was held that parol evidence was admissible not to vary the terms of the contract, but rather to show that what appears on its face as a valid, binding contract is, in fact, no such thing. However, Smith is distinguishable. There, the Court was of a mind that if the lease was executed and delivered to be used merely as a lever to oust the tenant in

possession, and it was then and there distinctly understood and agreed that it should serve no other purpose unless and until the tenant relinquished possession, then parol evidence would be admissible to show it was not a legally binding contract, although apparently so on its face. But when applied to the present case, the analogy fails. The School District would have to show that if the contract was entered into merely as a lever to oust Wilkerson out of her bartending job, and that it was then and there distinctly understood and agreed that it should serve no other purpose unless and until she relinquished that prior job, then parol evidence would be admissible to show it was not a legally binding contract. The object of this contract was employment in exchange for wages.

In Smith, the premises obviously could not be leased until the holdover tenant left. However, no such impediment exists here; Wilkerson could perform both jobs because she obviously did work them both. Further, a contract is not invalid simply because it does not contain all the provisions or conditions the parties might have incorporated into it.

Milhoan may have intended that while Wilkerson was an employee of the School District she not simultaneously be a bartender, but the way to deal with that concern is to provide for it in the contract. Our review of the contract discloses that there is no mention whatsoever in it of Wilkerson not holding a second job, or relinquishing one already held at the time of signing before taking a second job. There is nothing in the contract which suggests an intent to incorporate the conversation. Thus, the jury was free to conclude that that discussion did not vary the contract.

The second issue is whether Wilkerson's duty to quit the bartending job was a condition precedent to beginning the bus driving job. Certainly there was no such condition expressed in the contract. To determine whether it was an implied condition precedent, we look to the record to glean the demeanor and conduct of the parties. The School District contends it never would have allowed Wilkerson to drive the school bus and would not have executed the written agreement if it had known she had no intention of quitting the bartending job.

In its order, the District Court stated that School District 15 has a standing policy that anyone with a job at night that requires keeping late hours will not be hired as a bus driver. But in a deposition taken on February 14, 1984, Chris Mattocks, Superintendent of the School District, testified that there was no such written policy--that the difficulties encountered by holding two such jobs reflected his own feeling.

Wilkerson testified that she fully intended to quit bartending as soon as her first paycheck arrived from the School District, and that she could not afford to do so before that time. The School District concedes this was a disputed point. Such conflicts in the evidence were for the trier of fact to resolve, and it did resolve them, in favor of Wilkerson.

Further, even when specific language is included in a contract, it will not always be considered a condition precedent. As we stated in Palmquist v. Allardyce Petroleum Corp. (1974), 164 Mont. 178, 180, 520 P.2d 783, 784:

> "It is a principle of contract law that a mere stipulation or covenant in a contract will not be construed as a condition precedent, particularly

> where a forfeiture would result and where it
> appears a condition precedent, if desired, could
> have been provided for by express agreement."

Here, there was no mention at all in the contract of a stipulation or covenant by Wilkerson not to work a second job. If the School District had intended Wilkerson's terminating her first employment to be a prerequisite to hiring her, it could have been provided for in the contract. Whether the parties intended it to be so included was a question of fact, as we have noted, and the jury resolved that question in Wilkerson's favor.

The third issue is whether Wilkerson breached the contract by failing to satisfy a condition precedent by resigning her bartending job before beginning work with the School District as a bus driver. Because we hold that the jury verdict must be reinstated, this issue does not present to us a justiciable controversy. The jury could have found there was a condition precedent to quit her bartending job on September 20, and Milhoan's firing her on the 15th precluded Wilkerson from satisfying that condition. Or it could have found no condition precedent existed at all. Either option supports the jury verdict, and such verdict is entitled to the treatment accorded by our holding in Lackey, supra.

The standard of review in appeals from a judgment notwithstanding the verdict made pursuant to Rule 50(b), M.R.Civ.P. is the same as that for review of a motion for a directed verdict, and a directed verdict may be granted only where it appears as a matter of law that a plaintiff could not recover upon any view of the evidence, including the legitimate inferences to be drawn from it. Standish v. Business Men's Assur. Co. (1977), 172 Mont. 264, 265, 563 P.2d 552, 553. Further, in Jacques v. Montana Nat. Guard

(Mont. 1982), 649 P.2d 1319, 1325, 39 St.Rep. 1565, 1573, we noted:

> "Motions for directed verdict or for judgment N.O.V. are proper only when there is a complete absence of any evidence to warrant submission to a jury."

Here, there is evidence, proffered by Wilkerson, and conceded and defined by the School District as a "dispute in the evidence" whether Wilkerson promised to quit her bartending job immediately upon being hired as a bus driver, or whether she promised to quit after having received her first paycheck.

Because there was ample evidence upon which the jury could render its verdict, the District Court should have deferred to that verdict. It should not have set aside that verdict solely because it chose to believe testimony different from that believed by the jury. To do so would create a bench supremacy and sap the vitality of the jury verdict. Nelson v. Hartman (Mont. 1982), 648 P.2d 1176, 1178-1179, 39 St.Rep. 1409, 1412.

The evidence in this case was susceptible of more than one interpretation. We are satisfied there was substantial credible evidence in the record from which the jury could have resolved any conflict in favor of Wilkerson. Therefore, the District Court erred in granting the School District's motion for judgment notwithstanding the verdict.

We reverse the order of the District Court and remand for reinstatement of the jury verdict.

_____
Justice

We Concur:

- 10 -

_____
Chief Justice

_____
John Conway Harrison

_____
John C. Sheehy

_____
Justices