No. 87-66

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

SOMONT OIL COMPANY, INC.,
a Montana corporation,

        Plaintiff and Respondent,

  -vs-

JOHN KIEHL NUTTER and PEGGY FAYE
NUTTER,

        Defendants and Appellants.

---

APPEAL FROM: District Court of the Ninth Judicial District,
In and for the County of Toole,
The Honorable Robert Holter, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Ralph T. Randono and Daniel Donovan, Great Falls,
        Montana

    For Respondent:

        Marc G. Buyske; Anderson, Beatty & Lee, Shelby,
        Montana

---

Submitted on Briefs: Aug. 13, 1987

Decided: October 6, 1987

Filed: OCT 6 - 1987

*Ethel M. Harrison*

---

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal arises from a bench trial which occurred in the Ninth Judicial District on June 17 and 18, 1986, and thereafter by deposition, before the Honorable Robert M. Holter. The District Court issued a judgment supported by findings of fact and conclusions of law on December 18, 1986. Judgment was rendered in favor of plaintiff-respondent Somont Oil Company, Inc. ("Somont"). Defendants John and Peggy Nutter appeal. We affirm.

This appeal involves the parties' rights and obligations under an agreement to develop and operate a mineral interest on a parcel of land in Toole County, Montana. The Nutters own 80% of the mineral rights to the tract of land in issue. Respondent Somont claims the remaining 20% of the mineral rights. Additionally, Somont claims it is the proper lessee of one-half of the Nutters' mineral interests as assignees of a mineral lease executed by the Nutters to a third party. The sequence of events and pertinent facts in this case are fairly complex.

The original owner of the land involved was Anna Kenny who received ownership through a patent from the United States Government. Anna Kenny is now deceased. In 1920, Anna Kenny leased the mineral interests underlying the land to Gordon Campbell. Anna Kenny reserved a landowner's royalty interest and the lease was structured to remain in force for twenty years or for so long after that period that oil was produced from the land in commercial quantities. In 1922, Anna Kenny conveyed an interest to Stevenson Associated Royalties Company ("Stevenson"). In that conveyance, Kenny granted Stevenson 20% of her royalty payments under the lease

to Campbell. Additionally, Stevenson received a reversionary interest in 20% of the minerals in the event the Campbell lease was ever forfeited or cancelled.

Campbell eventually assigned his lease interest to Texaco, Inc. Texaco developed and maintained oil wells on the property but eventually ceased production. Texaco later abandoned the lease and filed a release on March 13, 1981. According to the terms of the lease with Campbell and the grant to Stevenson, 80% of the interest in the minerals underlying the land have reverted to the successors of Anna Kenny, while the remaining 20% reverted to the successors of Stevenson.

Upon Anna Kenny's demise, Marie Kenny succeeded to her interest in the land. In 1974, Marie Kenny conveyed the property to defendants John and Peggy Nutter. The contract for deed was recorded on January 2, 1976. A warranty deed executed by Marie Kenny was filed on February 20, 1981. By virtue of the conveyance and Texaco's abandonment of their mineral lease, the Nutters claim 80% of the mineral rights to the land.

Despite the conveyance to the Nutters, Marie Kenny conveyed an oil and gas lease on the same land to Somont in September of 1979. Because of the conveyance to the Nutters, both parties agree the lease from Marie Kenny to Somont is void. Somont filed a release of the void lease in August of 1984.

The remaining 20% mineral interest originally granted to Stevenson by Anna Kenny in the form of a reversionary interest follows a lengthy chain of title. We will discuss this chain of title more fully under the third issue raised by appellants. Suffice it to say that in 1980 Somont claimed title to this 20% mineral interest by instruments with the

3

personal representatives of one L.R. Baily, holder of one-half of the 20% interest, and the personal representative of one A.H. Raymond, holder of the other one-half. Subsequently, Somont began oil exploration and development on the property.

On March 6, 1981, the Nutters and Buffalo Jump Oil and Gas, Inc. ("Buffalo Jump"), a Montana corporation, entered into an oil and gas lease and a supplemental agreement to operate the mineral interests belonging to the Nutters. Appellant John Nutter and the president of Buffalo Jump, Chris Owen, negotiated the agreement. On May 1, 1981, Buffalo Jump assigned its interest in the Nutter lease and agreement to Rimrock Drilling Company ("Rimrock"). Rimrock is a partnership consisting of Chris Owen and Norman Eberhardt as partners. Rimrock subsequently developed oil wells which produced oil in commercial quantities. John Nutter assisted in the oil operation and the District Court found that he acted in the capacity of an employee rather than a joint operator. The result was that both Somont and Rimrock were simultaneously developing oil well operations on the land. Each operation maintained separate storage tanks and pipelines.

On February 1, 1984, Rimrock assigned its interest in the Nutter lease to Somont. The Nutters and Somont subsequently engaged in a dispute regarding their rights and obligations in developing and operating the oil pumping operation. Somont alleged John Nutter padlocked oil production equipment located on the property and sold approximately $5,000 of crude oil produced by Somont. Somont sought a declaratory judgment to clarify and determine the rights and obligations of Somont and the Nutters pursuant to the lease agreement between Buffalo Jump and the Nutters. A

4

complaint was filed with the District Court on March 22, 1984.

A preliminary hearing was held on March 30, 1984 and a stipulation was created dictating the oil operations until the time of trial. The stipulation directed a joint operation in which Somont would conduct the actual day-to-day operations subject to a right of inspection by the Nutters. Somont was to pay a portion of the gross proceeds of the operation into a special account established by the court pending the outcome of the litigation. An order directing the scope and contents of the stipulation was apparently signed on March 30, 1984, but was not filed until November 7, 1985 after a dispute arose between the parties while acting under the stipulation. Somont alleged that as a result of omissions and contradictory actions by the Nutters, it refused to make the scheduled payments. Following a hearing on November 7, 1985, the District Court issued findings of fact and an order stating that the order directing the stipulation was still in effect and Somont was ordered to make the payments.

The case was tried on June 17 and 18, 1986, and additional evidence was taken in July by deposition. On December 18, 1986, the District Court issued findings of fact, conclusions of law, and an order. The contested issues were resolved in favor of Somont.

The District Court concluded that as a result of the assignment from Rimrock to Somont, Somont held all of the rights and obligations of Buffalo Jump and Rimrock under the agreement entered March 6, 1981.

The District Court directed that Somont would continue to conduct the day-to-day operations in developing the mineral estate. It required Somont to operate "in a manner

5

consistent with good practices in the oil and gas industry and in conformance with the rules and regulations of the Board of Oil and Gas Conservation for the State of Montana." The Nutters were given the right to inspect the operations at any time, but were prohibited from interfering with the operations without the consent of Somont or a court order. Somont was required to provide the Nutters with monthly statements indicating gross production from the property, royalties paid, taxes paid, and operational and development costs.

Appellants have raised three issues for our consideration on appeal:

(1) Did respondent Somont acquire contract rights to develop and manage the mineral operations pursuant to the "Nutter-Buffalo Jump" contract?

(2) If Somont did acquire contract rights, did the District Court properly interpret the rights and obligations of the parties under the contract?

(3) Does Somont properly hold a 20% mineral interest in the property on a leasehold basis?

We will consider each issue separately. First, however, we must note that the standard of review on appeal is that the District Court's findings of fact will not be disturbed unless they are clearly erroneous. Rule 52(a), M.R.Civ.P. Further, respondent cites a statement made by this Court which is applicable under these circumstances:

> In a nonjury trial, the credibility of witnesses and the weight of their testimony are matters for the District Court to determine. The sufficiency of the evidence must be reviewed from the perspective most favorable to the prevailing party. The District Court's findings and judgment are presumed correct and will not be overturned unless

6

> the appellant meets the burden of proving with a preponderance of evidence that they are wrong. Merely showing the evidence establishes reasonable grounds for reaching a different conclusion is insufficient to reverse the District Court findings. Lumby v. Doetch (1979), 183 Mont. 427, 431, 600 P.2d 200, 202.

Frank L. Pirtz Const. v. Hardin Town Pump (Mont. 1984), 692 P.2d 460, 462, 41 St.Rep. 2366, 2368.

I. SOMONT'S CONTRACT RIGHTS

In March, 1981, the Nutters and Buffalo Jump entered an oil and gas lease along with a supplemental agreement to operate the mineral interests belonging to the Nutters. Buffalo Jump assigned the lease to Rimrock on May 1, 1981, and Rimrock then assigned the lease to Somont on February 1, 1984. The Nutters allege that the original contract with Buffalo Jump was too vague to constitute a contract. The Nutters contend the Buffalo Jump agreement was merely "an agreement to agree" and not a binding contract. Therefore, they argue, the later assignment to Somont is invalid.

The agreement entered between Buffalo Jump and the Nutters on March 6, 1981, consisted of two documents: (1) a standard form oil and gas lease with certain portions deleted and other portions added; and (2) a supplemental agreement consisting of six pages. The oil and gas lease was specifically made subject to the supplemental agreement. The supplemental agreement provided the parties would enter a formal operating agreement after two wells were drilled. The "formal operating agreement" was to "embody and embrace all of the terms and conditions necessary to cope with all information, data, and knowledge which has been acquired from the drilling of the first two wells . . . " Although Rimrock

7

subsequently drilled eight wells, the parties never entered into a formal operating agreement. The Nutters contend the agreement actually entered contained almost no specifics and that the parties merely agreed to reach various future agreements. As examples, the Nutters state the document states they will determine the locations of additional oil wells and the terms of the formal operating agreement in the future. The Nutters contend the result is that the agreement with Buffalo Jump was not a binding contract, but simply an "agreement to agree."

As a general rule, the terms of a contract must be reasonably certain. See, Bishop v. Hendrickson (Mont. 1985), 695 P.2d 1313, 1314, 42 St.Rep. 259, 260. However, it is also true that "if the material elements are stated in general terms, all the details or particulars need not be stated." McNabb v. Norine (1983), 204 Mont. 330, 335, 664 P.2d 927, 930.

Respondent Somont points out a number of specific items that were part of the agreement, including:

> [T]hat the mineral interest of the Nutters would be developed by Buffalo Jump at no personal expense to Nutters; that a certain number of wells would be drilled within a specific period of time; that the wells would be drilled to test a particular geological formation; that after Buffalo Jump recovered certain specific development and operational costs, Buffalo Jump and Nutters would share the net profits from production on an equal basis; that equipment actually contributed by a party, would belong to such party; that Buffalo Jump would perform all office and administrative work necessary to production; that any landowner's royalty interest owned by either party would be paid as all other landowner's royalty and not count toward

8

the owner's share of net profits; and, that the agreement could be "amended and changed from time to time in accordance with the agreement of the parties."

The agreement included the subject matter of the contract, the division of profits, payment of operating expenses, and certain references to the time frame involved. Admittedly, the agreement does not include every item that might have been included in regards to the actual operational aspects. However, "a contract is not invalid simply because it does not contain all the provisions or conditions the parties might have incorporated into it." Wilkerson v. School District No. 15, Glacier County (Mont. 1985), 700 P.2d 617, 621, 42 St.Rep. 745, 749.

An additional reason why the Buffalo Jump-Nutter agreement is a valid contract is because the Nutters performed under that agreement as if it were valid. Until Somont received the assignment of the lease in February of 1984, Rimrock drilled and completed eight wells without any objection from the Nutters as to whether the agreement was valid. "Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed." Restatement (Second) of Contracts § 34(2) (1979). The parties performed under the agreement for nearly three years and such performance strongly indicates a valid contract existed. Therefore, we conclude that performance under the agreement combined with the actual terms provided demonstrate the existence of a valid contract.

In the alternative, the Nutters contend that if a valid contract existed it was personal in nature and therefore nonassignable. The Nutters state they entered the Buffalo Jump agreement relying on the particular personality and skill of those people operating the Buffalo Jump corporation.

9

It is contended that the personal nature of the agreement is evidenced by the fact that several points were left to future mutual agreements by the parties: well locations, arrangements for developing wells, and the terms of an operating agreement. The Nutters allege they entered the agreement based on an estimate of the personalities of each party and their ability to work comfortably together. The Nutters conclude that when Rimrock assigned the agreement to Somont without their permission they were deprived of the benefit of their bargain.

We recognize that rights arising under a contract are generally assignable unless the contract prohibits assignment. See, Standard Sewing-Machine Co. v. Smith (1915), 51 Mont. 245, 248, 152 P. 38, 39. The assignment is not prohibited by the Buffalo Jump-Nutter agreement. The supplemental agreement is silent as to assignments and the lease document appears to contemplate the possibility of assignment by making a reference to the lessors "heirs, successors and assigns."

Despite the fact that the agreement does not prohibit assignment, the Nutters point out that an exception to the general rule is when a contract is personal in nature and an assignment would deprive a party to the contract of the benefit of his bargain. We agree that a contract may be so personal in nature that the assignment of rights and delegation of duties under the contract should be prohibited. As stated by the Supreme Court of California:

> The terms and purpose of a contract may show, however, that it was intended to be nonassignable. Thus the duties imposed upon one party may be of such a personal nature that their performance by someone else would in effect deprive the other party of that for which he bargained.

10

> The duties in such a situation cannot be delegated. (Citation omitted.) Rights likewise cannot be assigned if the assignment would materially impair the nonassigning party's chance of obtaining the performance he expected. (Citation omitted.)

Farmland Irrigation Co. v. Dopplmaier (Cal. 1957), 308 P.2d 732, 740, 741. The Restatement (Second) of Contracts § 317(2) (1979) similarly recognizes that the assignment of a contractual right should be prohibited if

> (a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him . . .

Likewise, the Restatement addresses the delegation of a duty and states:

> (2) Unless otherwise agreed, a promise requires performance by a particular person only to the extent that the obligee has a substantial interest in having that person perform or control the acts promised.

Id. at § 318(2).

With the above rules in mind, we agree with respondent Somont in that the duties imposed on Buffalo Jump "were not so unique in the oil and gas industry as to involve a degree of trust and confidence singularly personal to the contracting parties." We reach this conclusion by examining a number of factors. As noted, the supplemental agreement fails to prohibit any assignment or delegation, and the lease itself appears to contemplate the possibility of assignment. The agreement actually was assigned from Buffalo Jump to

11

Rimrock on May 1, 1981. None of the parties involved objected to the assignment and Rimrock continued oil production for nearly three years without any objection. Although Buffalo Jump and Rimrock appear to be related entities, the assignment indicates that assignments were not prohibited. We affirm that the contract was assignable.

The Nutters also challenge the District Court's conclusion that the Nutters were estopped from alleging the contract with Buffalo Jump was invalid. Since we have already considered appellants' argument regarding the invalidity of the agreement and decided the agreement was a valid assignable contract, this issue need not be discussed.

II. INTERPRETATION OF RIGHTS AND OBLIGATIONS UNDER THE CONTRACT.

The supplemental agreement to the Buffalo Jump-Nutter contract indicates that the parties would operate the oil operation as joint operators. The District Court concluded that the agreement was ambiguous as to who should conduct the day-to-day operations of the property. The District Court found the ambiguity was compounded because Mr. Nutter acted as an employee and not a joint operator. In resolving the conflict between the parties, the court directed Somont to conduct the daily operations and granted the Nutters a right of inspection:

> Somont shall continue to conduct the development and operation of the mineral estate underlying the E½ of Section 15 in a manner consistent with good practices in the oil and gas industry and in conformance with the rules and regulations of the Board of Oil and Gas Conservation for the State of Montana. Nutters have the right to inspect such operations at any time but may not

> physically interfere with the operations unless they have Somont's consent or unless they have an order of the Court.

Conclusions of Law dated December 18, 1986 at 8. The Nutters contend they are entitled to a joint operator status in the day-to-day operations. Additionally, they request the power to make decisions regarding the daily operations if the parties are unable to agree.

We agree with the District Court that the agreement is not entirely clear as to who will conduct the actual daily operations. The agreement does indicate that the Nutters and Buffalo Jump are to be joint operators, but also seems to imply that the daily operations are to be performed by Buffalo Jump. For example, Buffalo Jump is given the task of performing the necessary administrative functions, determining the capability of commercial production, and paying development and operation costs. Evidence was presented demonstrating that when Mr. Nutter worked on the oil operations he did so as an employee rather than a joint operator. Mr. Nutter himself gave the following testimony:

> Q: I refer you back to testimony that was given with reference to your working on the east half of Section 15, Township 35 N, Range 2 W, and you did work on that lease after the Buffalo Jump Oil and Gas lease was executed, signed and delivered?
>
> A: Yes.
>
> Q: In what capacity?
>
> A: At different times I did different things. I worked on the rig when we were drilling the wells.
>
> Q: Were you an employee?
>
> A: Supposedly, yes.

13

Q: And, were you supposed to be paid for that?

A: Yes.

We conclude that the District Court decision to grant Somont the authority to conduct the daily operations subject to a right of inspection by the Nutters is correct. Despite this conclusion, the Nutters retain a significant amount of control over the oil operations in that they have the right to inspect the operations at any time; receive monthly statements from Somont indicating gross production, royalties paid, taxes paid and operational and development costs; and to request and receive an explanation of any specific development and operational cost item they question. Additionally, the District Court order requires Somont to follow good practices within the industry and to conform with applicable state regulations and rules.

III. SOMONT'S 20% MINERAL INTEREST.

Somont asserts it holds a valid lease to the remaining 20% mineral interest for the parcel of land in question. This lease interest is derived from a lengthy chain of title and originated when Anna Kenny granted Stevenson Associated Royalites Company a 20% reversionary interest in the mineral estate in 1922.

In 1926, Stevenson conveyed the interest by warranty deed to Sunburst Oil and Refinery Company. That deed purported to transfer "any and all interest . . . to real estate. . . in the State of Montana." Sometime during the 1930s, Sunburst became insolvent. In October of 1939, a federal court order authorized Sunburst's receiver, John Hamilton, to transfer Sunburst's assets. Hamilton transferred the property interest by deed to V.B. Carlson in

14

1939. That deed purported to convey "all and singular of the undesignated and unknown assets . . . wherever situated within the state of Montana." V.B. Carlson conveyed the interest to L.R. Baily by quitclaim deed in March of 1940. That deed purported to convey "every species of real property . . . which Grantor owned or claimed to own within Toole County, Montana." The remaining transfers in the chain of title purport to transfer the interest acquired from Carlson and no legal description is offered. L.R. Bailey made a conveyance of one-half of his interest by quitclaim deed in May of 1947 to Hazel Deschon. That same month, Hazel Deschon transferred her interest to A.H. Raymond by quitclaim deed. In 1980, Somont obtained a lease interest on the entire 20% by entering an oil and gas lease with both L.R. Baily's personal representative and A.H. Raymond's personal representative.

The Nutters claim Somont's lease is invalid because the deeds within the chain of title were too vague and indefinite to pass marketable title, and several deeds failed to include any description of the land involved. The District Court examined the deeds comprising the chain of title and concluded they were sufficiently definite. The majority rule is "that a deed describing land as 'all' the grantor's property or 'all' his property in a certain locality is not defective or void for want of a sufficient description . . . " 23 Am.Jur.2d Deeds § 59 (1983). See also, Wilson v. Boyce (1875), 92 U.S. 320, 325, 23 L.Ed. 608, 610. We agree with the District Court and find that the deeds were sufficiently definite. Moreover, we note that several of the deeds refer specifically to oil and gas interests and royalties.

Finally, the Nutters claim the chain of title is defective because there is no evidence in the record to establish John Hamilton's authority to act as a receiver. However, a review of the District Court file demonstrates that an order issued by the United States District Court, District of Montana, granted Hamilton the authority to act as receiver and convey assets of Sunburst Oil and Refining Company. Therefore, this contention is without merit.

For the foregoing reasons we affirm the decision of the District Court.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices