No. 93-646

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

RONALD C. KOEPPLIN,

      Plaintiff and Appellant,

-v-

ZORTMAN MINING, INC.,
a Montana Corporation,

      Defendant and Respondent.

APPEAL FROM: District Court of the Seventeenth Judicial District,
In and for the County of Phillips,
The Honorable Leonard H. Langen, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Jerrold L. Nye, Nye & Meyer, Billings, Montana

      For Respondent:

          Steven J. Lehman, Crowley, Haughey, Hanson, Toole &
Dietrich, Billings, Montana; Thomas E. Hattersley,
III, Gough, Shanahan, Johnson & Waterman, Helena,
Montana

Submitted on Briefs: May 26, 1994

Decided: September 15, 1994

FILED

Filed: SEP 15 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Plaintiff Ronald C. Koepplin appeals the Memorandum Opinion and Order of the District Court of the Seventeenth Judicial District, Phillips County, which granted defendant's motion for summary judgment. We affirm.

The sole issue for review is whether the District Court erred in granting summary judgment in favor of the defendant on Koepplin's claims for wrongful discharge, invasion of privacy and malice.

Ronald C. Koepplin (Koepplin) worked for Zortman Mining, Inc. (Zortman) from October 1991 until his termination on February 17, 1993, when Zortman discharged Koepplin from his job as a haul truck driver. Koepplin had worked at the Zortman mine in other capacities dating back to 1986 when the mine was under other ownership.

Frank Green (Green) supervised Koepplin. In January of 1993, Green noticed there was tension and discord among crew members. Upon inquiry of crew members, Green was told that Koepplin had been verbally deriding and "downgrading" co-employees, intimidating them and throwing items on the lunch bus. On February 14, 1993, a female crew member reported to Green that she had experienced numerous incidents of egregious sexual harassment from Koepplin. Green transcribed the employee's oral statement onto an Employer Personal File Entry form on February 14, 1993 and called Mine Superintendent Clayton Krall (Krall) because of the seriousness of the complaint.

2

On February 15, 1993, Zortman management employees Green, Krall, George Lytle (Lytle), and Jim Geyer (Geyer) began to investigate the complaints against Koepplin. Their investigation included interviews with persons who had witnessed Koepplin's treatment of the female employee. These interviews indicated that there were more problems with Koepplin's conduct that the sexual harassment incidents.

As a result of the interviews, Koepplin was called into Lytle's office later that day to meet with Geyer, Krall and Lytle so that he could tell his side of the story involving the female employee and also his side of an incident involving a scuffle with another male employee. Koepplin denied the sexual harassment and termed the scuffle "calisthenics." Krall advised Koepplin in detail regarding the complaint from the female employee; Koepplin denied the sexual harassment. At the conclusion of the meeting, Koepplin was suspended pending further investigation of the complaint and was asked to return the morning of February 17, 1993 for another meeting with management. Koepplin was told specifically not to threaten or intimidate anyone involved in the investigation.

Despite being told not to threaten or intimidate investigators, Koepplin made telephone calls to his supervisor (Green) and the three other mine managers (Krall, Lytle and Geyer) after 10:00 p.m. that same evening. Krall, Lytle and Geyer all testified they felt threatened by Koepplin's calls to them. Geyer testified that from the tone of voice and the words used, he felt threatened and believed that Koepplin was trying to intimidate him.

3

Geyer immediately reported the threat to the Phillips County Sheriff.

The next day, after discovering Koepplin had similarly called other mine managers, Geyer provided the sheriff with information about these calls also. Geyer specifically reported Koepplin's intent to take Lytle on a "trip to hell." Koepplin testified in his deposition as follows:

[By Mr. Hattersley] . . . As you left the meeting from George's office, when George, Jim, Clayton and you were there. You know what meeting I'm talking about, right, when they told you you were suspended. You know what meeting I'm talking about.

A.   Yes, sir.

Q.   You were also told that you were not to threaten or intimidate anyone involved in the investigation; isn't that right?

A.   Yes, sir.

Q.   Clearly told that, right?

A.   Yes, sir.

Q.   Who told you that?

A.   Jim Geyer.

. . .

Q.   Then you called George Lytle, didn't you?

A.   Yes, sir.

Q.   And you said to George, "Do you have a suitcase?"

A.   I asked him.

Q.   You asked him if he had a suitcase?

A.   Yes, sir.

Q.   Why did you ask if he had a suitcase? What was your purpose in asking that?

4

A.  Because he was going to need it.

Q.  Why did you think he was going to need it?  Did you tell him he was going to need it?

A.  I asked him.

Q.  You asked him if he had a suitcase?

A.  Yes, sir.

Q.  And you said the reason you asked is because you felt he was going to need it, right?

A.  Best get 'er packed.

Q.  And that's what you said to him, right?

A.  Yes, sir.

Q.  Why in your mind did you think that he needed a suitcase?

A.  Because I do believe George Lytle is a lot of my problems here in this situation.

Q.  But why would he need a suitcase if he's part of your problem in your view?

A.  At one time earlier, I called George Lytle a court jester.

Q.  But why did you think he was going to need a suitcase packed and why did you tell him that?  In your mind, why did you tell him those things?

A.  Because he's going to need it.

Q.  Why was he going to need it from your standpoint?

A.  For his little trip.

Q.  What was his little trip going to be?

A.  To hell.

Q.  And that's what you told him, right?

A.  Yes, sir.

Lytle, Krall and Geyer all felt that Koepplin's calls to them were threatening and intimidating and all hung up on Koepplin.

5

Koepplin testified he called the managers because he was concerned about his job and that he was not angry nor did he intend to threaten or intimidate anyone. Koepplin had also acted in a threatening and excitable manner during the meeting the previous day, according to testimony by management employees. The investigation conducted by mine management elicited information from other employees that they, too, were concerned with their safety and the safety of others because of Koepplin's threats.

Zortman's personnel policy provided for different "levels" of discipline, including termination if warranted by the serious nature of the circumstances involved. Because of Koepplin's most recent threats to management and his prior behavior as reported by co-employees and as noted in his personnel file, Zortman managers decided to terminate Koepplin's employment at the prearranged meeting on February 17, 1993.

Sheriff Eugene Peigneux was asked to be present at the meeting in order to keep the peace should Koepplin become violent. Sheriff Peigneux testified that he decided to frisk Koepplin when he arrived for the meeting. He further testified that this was his own independent decision based on his professional training and experience and that Zortman had not requested this be done. Koepplin testified that his feelings were not hurt by this conduct and that after he was frisked, he got a cup of coffee and asked the sheriff and the two deputies if they cared for a cup also. Sheriff Peigneux also decided to have one of his deputies patrol the Zortman area during his regular shift for the next few days in order to keep an eye on Koepplin.

6

After his termination, Koepplin brought this action for wrongful discharge, invasion of privacy and malice. Further facts are provided throughout this opinion.

**Did the District Court err in granting summary judgment in favor of the defendant on Koepplin's claims for wrongful discharge, invasion of privacy and malice?**

Our standard of review for an appeal of a district court's summary judgment decision is the same as that used by the district court under Rule 56(c), M.R.Civ.P. Morton v. M-W-M, Inc. (1994), 263 Mont. 245, 249, 868 P.2d 576, 578. Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. The party seeking summary judgment bears the burden to show the Court that it has met the standards set forth in Rule 56(c), M.R.Civ.P. Morton, 868 P.2d at 579. If the moving party has met this burden of proof, the nonmoving party has the burden of showing that a genuine issue of material fact exists or that the moving party is not entitled to judgment as a matter of law. Morton, 868 P.2d at 579. When raising the allegations that disputed issues of fact exist, the nonmoving party has an affirmative duty to respond by affidavits or other sworn testimony containing material facts that raise genuine issues; conclusory or speculative statements will not suffice. Morton, 868 P.2d at 579.

WRONGFUL TERMINATION

Under the Wrongful Discharge from Employment Act (the Act), an employee who has completed the employer's probationary period has a valid ground for maintaining a cause of action against the

7

employer if the employee's discharge was not for "good cause." Section 39-2-904(2), MCA. The Act defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Section 39-2-903(5), MCA.

The issue in this case is whether Koepplin was properly terminated for disruption of the employer's operation or other legitimate business reason. A "legitimate business reason" is defined as "a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." Kestell v. Heritage Health Care Corp. (1993), 259 Mont. 518, 525, 858 P.2d 3, 7. The District Court emphasized disruption in the work place, noting that Zortman had the right to serve its own business interest as well, stating as follows:

> Koepplin's threat that he was going to send a supervisor on a trip to hell was shocking and outrageous, and no employer under Montana law has to tolerate threats and abuse of that nature. This threat by Koepplin was disruptive to the Zortman work place and gave Defendant good cause to discharge him from employment.
>
> In his Reply Brief, Koepplin's attorney argues that Koepplin did not intend this statement to be a threat. Koepplin's attorney cites no Deposition or Affidavit for this assertion. Without any basis in the factual record, the attorney for Koepplin has put his own interpretation on the statement arguing he can tell the jury that it was not a threat. Since Defendant has the right to serve its own legitimate business interest in discharging the Plaintiff, the proper focus of the inquiry should not be on whether Plaintiff's attorney characterizes this statement as a threat, but whether the statement was heard as a threat by George Lytle. George Lytle specifically testified he found the statement threatening.

Koepplin testified in his deposition that he called the managers because he was concerned about his job. He further stated he was not angry at the time, had consumed beer that evening and denied that his conversation with Lytle constituted a threat. He claims that he was making use of Zortman's "open door" policy and that his discharge from employment did not comply with the terms of Zortman's written personnel policy.

The undisputed facts which the District Court relied on center around Koepplin's telephone calls to Zortman managers on the night of February 15, 1993, particularly the call to Lytle. Both Krall and Geyer hung up on Koepplin and testified they interpreted the calls as threatening. Geyer called the Phillips County Sheriff after he hung up on Koepplin. The third call Koepplin made was to Lytle and the substance of that call is quoted above as testified to by Koepplin in his deposition. Earlier that day, Koepplin was specifically told not to threaten or intimidate any person involved with the investigation of the sexual harassment complaint.

Despite being warned not to threaten anyone involved in the investigation, Koepplin called Krall, Geyer, Lytle and Green after 10:00 p.m. that same evening. These four men were in attendance at the meeting when Koepplin was suspended. Koepplin's disingenuous contention that he was making use of the Zortman's "open door" policy is unconvincing. Koepplin knew that management was investigating the incidents. He had been suspended during the investigation and told to come back for another meeting two days later.

If there were matters of importance concerning the

investigation, Koepplin would have had an opportunity to respond to them at a later time. Koepplin testified to no such concerns, he did not discuss them at the meeting when he was terminated and he did not raise them after his termination. An employer's "open door" policy does not exist for the purpose of allowing employees to threaten or otherwise intimidate management; it is used for the purpose of encouraging meaningful communication between employer and employee relating to the employer's operations.

Koepplin testified that his statements to Lytle--that he had best get his suitcase packed for his "little trip to hell"--were not threats. He did not testify what he intended by them. He merely testified that he was concerned about his job. Lytle testified he felt threatened by the conversation. We agree with the District Court that the proper emphasis here is whether the statements were heard as a threat by Lytle and not whether Koepplin's attorney characterizes them as a threat.

The District Court termed Koepplin's threats to Lytle as "shocking and outrageous" and stated that under Montana law, no employer has to tolerate threats and abuse of that nature. Geyer's call to the sheriff after hanging up on Koepplin and his subsequent request for the sheriff's presence at Koepplin's termination reinforce Zortman's contention that Koepplin's statements were taken seriously. Zortman's personnel policy has three "levels" of disciplinary treatment which may apply according to the severity of the particular circumstances. It provides for immediate termination under certain enumerated circumstances depending on the seriousness of the situation. We conclude that, in the overall

10

context of this case, Koepplin's threat to send Lytle on a "little trip to hell" was at least insubordination which justified immediate termination under Zortman's personnel policy. We further conclude that the District Court properly characterized this conduct as disruptive to the work place and that Zortman had the right to serve its own legitimate business interest by discharging Koepplin under the circumstances of this case.

Moreover, Krall and Geyer both testified by deposition that Koepplin told them he would have his "mouthpiece" with him at the meeting and that it was the sort you would say "sir" to. Although Koepplin did not admit to these statements, he did admit that both Geyer and Krall hung up on him. It is further undisputed that Geyer called Sheriff Peigneux after hanging up on Koepplin. Koepplin has not presented any evidence that there is an issue of material fact relating to his wrongful discharge claim. This Court has previously held that a party cannot create a disputed issue of material fact by putting his own interpretations and conclusions on an otherwise clear set of facts. See, e.g., Sprunk v. First Bank Sys. (1992), 252 Mont. 463, 466-67, 830 P.2d 103, 105. We conclude Koepplin's conclusory and interpretive statements of material fact do not rise to the level of genuine issues of material fact required to defeat Zortman's motion for summary judgment on Koepplin's claim for wrongful discharge.

INVASION OF PRIVACY

Koepplin contends that Zortman requested the Phillips County Sheriff's presence at the termination meeting and that the ensuing frisk was a violation of his right of privacy. He maintains that

11

the sheriff's actions cannot be separated from Zortman's because Zortman had asked Sheriff Peigneux to be there.

Sheriff Peigneux and two deputies were present and frisked and searched Koepplin upon his arrival. They did not frisk Koepplin's wife who accompanied him to the meeting. The frisk and search lasted for less than two minutes, according to Koepplin's testimony. After the termination, one of the deputies was assigned to patrol the Zortman area exclusively for a few days because of the circumstances surrounding Koepplin's termination. Jim Geyer requested that Sheriff Peigneux be present at Koepplin's termination "to keep the peace." Sheriff Peigneux asked that the request and the reasons for asking for assistance be made in writing. Geyer provided a written request, giving details of the call he received as well as the calls received by Krall and Lytle. This was the only request made of the sheriff by any Zortman employee. The decisions to frisk Koepplin and to have a deputy patrol the Zortman area for a few days were made independently by Sheriff Peigneux based on his professional judgment.

The District Court found that the officers' search was not a substantial invasion of a legally protected interest, that Koepplin had provided no authority to support an invasion of privacy tort theory, and that the search of Koepplin was part of his being fired and could not be separated from the termination.

Koepplin cites Johnson v. Supersave Markets, Inc. (1984), 211 Mont. 465, 686 P.2d, 209, for the premise that a person's right to liberty is legally protected from invasion and his emotional distress proximately caused thereby are recoverable damages for

12

invasion of privacy. He maintains that <u>Johnson</u> held that the invasion of privacy itself could cause substantial emotional distress in and of itself. Koepplin's argument relates to a constitutional protection found in Article II, Section 10 of the Montana Constitution and involves Sheriff Peigneux's independent decision to frisk and search him. We conclude there is no evidence that Zortman participated in the decision to frisk and search Koepplin nor has any agency relationship been established. Thus, there is no invasion of privacy proximately caused by Zortman's request for the sheriff "to keep the peace."

## MALICE

As conceded in his brief, Koepplin has no independent claim for malice. Pursuant to our ruling on his claims for wrongful discharge and invasion of privacy, Koepplin has no cause of action for which damages for malice may be awarded.

We hold the District Court properly granted summary judgment in favor of the defendant on Koepplin's claims for wrongful discharge, invasion of privacy and malice.

Affirmed.

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
Justice

13

September 15, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:

Jerrold L. Nye, Esq.
Nye & Meyer, P.C.
3317 Third Ave. No.
Billings, MT 59101

Steven J. Lehman, Esq.
Crowley, Haughey, Hanson, Toole & Dietrich
P.O. Box 2529
Billings, MT 59103

Thomas E. Hattersley, III
Gough, Shanahan, Johnson & Waterman
P.O. Box 1715
Helena, MT 59624-1715

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
Deputy