Suzanne J. MARCY, Plaintiff–Appellee,

v.

DELTA AIRLINES, a Georgia corporation, Defendant–Appellant.

Nos. 97–35464.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1998.

Decided Feb. 5, 1999.

---

Lawrence H. Wexler, Atlanta, GA, for Defendant–Appellant.

Michael J. San Souci, Bozeman, MT, for plaintiff–appellee.

Before: BOOCHEVER, REINHARDT, and GRABER, Circuit Judges.

BOOCHEVER, Circuit Judge:

In this case, we must determine whether the Montana Wrongful Discharge from Employment Act ("WDEA"), Mont.Code Ann. §§ 39–2–901 et seq., provides a cause of action to an employee discharged by her employer for a reason based on mistaken facts, but where the employer exercised good faith in reaching its decision.

After a jury found that Delta Airlines wrongfully discharged Suzanne Marcy under the WDEA and the district court entered judgment for Marcy, Delta moved for judgment as a matter of law, or in the alternative, for a new trial, arguing that Marcy had failed to state a valid claim under the WDEA because she did not sufficiently prove that Delta had acted in bad faith in discharging her. The district court denied both motions, and Delta filed this timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I. FACTS

Suzanne Marcy became an employee of Delta Airlines in 1987 when Delta merged with Marcy's former employer. At the time of her discharge, Marcy worked as a Senior Customer Service Representative at Delta's Gallatin Airport facility in Bozeman, Montana. She was generally rated as an "outstanding Delta employee." Delta terminated Marcy after she submitted her payroll records with three incorrect entries which would have allowed her to collect about $250 in unearned wages. While Marcy acknowledges that there were mistakes on her payroll records, she has maintained all along that the mistakes were unintentional, and that such mistakes were common in Delta's payroll system. Delta, on the other hand, has been equally steadfast in its assertion that Marcy's mistakes were part of an intentional plan to defraud the company. Marcy's mistakes were contained in two Delta personnel documents—the "Daily Work Schedule" and the "Daily Attendance Record."

Delta's scheduling tool at the Bozeman facility, called the Daily Work Schedule ("DWS"), was basically a sheet listing which shift and in what position each employee had been assigned to work for that day. The DWS would also list, among other things, which employees had taken that day off using vacation or compensatory ("comp") time. The DWS was prepared by Delta supervisors weekly, and approximately seven to ten days in advance. Schedule changes due to employees calling in sick or swapping shifts, for example, were not uncommon, and because the DWS was not always updated to include these changes, the actual number of hours that an employee worked might not be accurately reflected in the DWS.

The Daily Attendance Record ("DAR") was the document used by Delta to track the

hours its employees worked and to calculate payroll. For example, an employee who recorded that she worked from "6:00 to 12:00" in the DAR would be paid for six hours. Delta employees were responsible for recording their own hours in the DAR on a daily basis, and Delta relied on its employees to record their information accurately.

When an employee wanted to take time off using her accrued vacation or comp time, Delta required the employee to follow several procedures. First, she had to obtain approval from a Delta supervisor by having the supervisor sign a "Time–Off Request Form." The supervisor would then staple the signed Time–Off Request Form to the back of the DWS for the day that the employee was taking off. Second, the employee would have to make a special notation on her DAR so that she would be paid for her time off, but would also have her vacation or comp time account deducted. For example, an employee using a vacation day would record "6:00 to 12:00—VAC DAY 6.0" in her DAR. This would inform Delta that it should pay the employee for six hours that day, but that it also should deduct six hours from that employee's vacation account. An employee using comp time to take all or part of a day off was similarly required to make a notation on the DAR so that her comp time account could be deducted.

When Marcy submitted her DAR for the first two weeks of May, 1993, it contained three mistaken entries, each involving the failure to note on the DAR that she had used vacation or comp time to take time off. These mistakes, left unnoticed, would have resulted in Marcy being paid about $250 in unearned wages without having her vacation or comp time accounts deducted.

The first mistaken payroll entry was for May 4, 1993. Marcy did not work her entire shift, but used 2.5 hours of comp time to leave her shift early. On her DAR, however, Marcy wrote down that on May 4 she worked from "6:00 to 12:30," and failed to include a notation that she had used any comp time. On the next day, May 5, Marcy took the entire day off using 6 hours of comp time. Again, however, she recorded that she worked from "6:00 to 12:30," without including a notation that she had used any comp time.

Marcy's third mistaken payroll entry was for May 10, which Marcy had taken off using a vacation day. On her DAR, however, Marcy recorded that she worked from "6:00 to 12:30," and failed to include a notation that she had used a vacation day. There were also inconsistencies on the DWS. An entry on the DWS that had once reported Marcy as being on vacation that day had been erased. Further, Marcy's name had been added to the DWS, in Marcy's handwriting. Finally, Marcy's Time–Off Request Form granting her permission to use a vacation day on May 10, which originally had been stapled to the May 10 DWS, was no longer attached.

Marcy's supervisor, Pam Bracken discovered the mistakes on May 11, and informed the station manager, Jack Reese, on May 14. They both agreed that they would not ask Marcy about the mistakes, but would return the DAR to where it belonged and see if Marcy would correct the mistakes on her own. The DAR binder was available to Marcy on May 11, 12, and 17, but she did not correct the mistakes. Reese and Bracken confronted Marcy on the morning of May 18. Marcy stated that all of the false entries were the result of honest mistakes. Marcy explained that on May 17, she had tried to find the DAR to see if her DAR entries were correct, but she could not find it because it was not hanging where it was supposed to be. Marcy stated that because she had taken off seven days that pay period using vacation and comp time, and had also switched shifts with another employee to take an eighth day off, she wanted to check the DAR to make sure it was correctly updated.

Later, after she became busy handling a flight, she stated that she simply forgot to go back to look at the DAR. Marcy was not worried though, because she stated that mistakes were not uncommon in Delta's payroll system, and that it was Bracken's usual practice to call employees to clarify any discrepancies between the DWS and DAR. Marcy assumed that she could correct any mistakes when Bracken asked her.

Marcy could not explain why her Time–Off Request form was missing or why her name was erased as an employee on vacation on the May 10 DWS sheet. She stated that the entry, made in her handwriting, adding her to the May 10 work schedule was the result of a simple mistake—Marcy thought that she was writing on the DWS sheet for May 11, when she actually was scheduled to work. She also stated that she told Reese that a co-worker, Stephanie Dunagan, would verify her story, but he did not investigate.

Based on the false payroll entries, as well as a previous incident of alleged fraud involving personal long-distance phone calls of minimal value made by Marcy, Reese prepared a report recommending the termination of Marcy. Other than interviewing Marcy, Reese did not question any witnesses or investigate any further. On May 18, Marcy's case was forwarded to Delta headquarters in Atlanta for review by a four-person panel consisting of Delta managers. Reese indicated that he thought Marcy's actions were intentional, and recommended that Marcy be terminated. The panel decided to terminate Marcy. On May 27, Reese called Marcy into his office and offered Marcy the right to resign, but she refused. Marcy was then terminated.

## II. PROCEDURAL HISTORY

In December 1993, Marcy sued Delta in Montana state court, alleging numerous claims relating to her discharge, including one for wrongful discharge under the Montana WDEA. Delta removed the case to the United States District Court for the District of Montana. At the end of discovery, Marcy's only remaining claims were for wrongful discharge and defamation. At the end of Marcy's case-in-chief, Delta moved for a directed verdict, arguing that Marcy had failed to present any evidence that Delta's reason for terminating her was a pretext and not the honest reason, as required by the WDEA. The district court denied Delta's motion. A jury then found for Delta on the defamation claim, but returned a verdict in favor of Marcy on the wrongful discharge claim and awarded her $66,000 in damages.

Delta moved for judgment as a matter of law, or in the alternative, for a new trial, arguing that the Montana WDEA does not provide a cause of action to a discharged employee where the employer has acted in good faith, even where the reason given for the discharge is based on mistaken facts. To prove that an employer acted in bad faith, Delta argued, the WDEA required a plaintiff to prove that the stated reason for her discharge was pretextual and not the honest reason. The district court denied both motions and held that the WDEA did not require Marcy to prove that Delta's stated reason for discharging her was pretextual.

Delta appeals the district court's denial of its motions for judgment as a matter of law and for a new trial.

## III. STANDARD OF REVIEW

■■■ We review *de novo* a district court's denial of a motion for judgment as a matter of law. *See, e.g., McClaran v. Plastic Indus., Inc.,* 97 F.3d 347, 354 (9th Cir.1996). This court will not overturn a district court's denial of a motion for a new trial absent an abuse of discretion. *See Scott v. Ross,* 140 F.3d 1275, 1281 (9th Cir.), *petition for cert. filed,* 67 U.S.L.W. 3376 (U.S. Nov. 24, 1998) (No. 98–878); *EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997). The district court's interpretation of Montana state law is reviewed *de novo. See Coughlin v. Tailhook Ass'n,* 112 F.3d 1052, 1055 (9th Cir.1997). This court must interpret and apply Montana law as it believes the Montana Supreme Court would apply it. *Id.*

## IV. DISCUSSION

The parties disagree whether an employer may be held liable for wrongful discharge under the WDEA when the employer makes its decision to discharge in good faith, but where the reason given rests on a mistaken interpretation of the facts. Under Delta's proposed interpretation of the WDEA, so long as the employer acts in good faith, it cannot be held liable for wrongful discharge, even if the factual bases that it relies upon are mistaken. For example, if an employer in good faith discharges an employee for stealing, but when the facts are later brought

before a jury, the jury determines that there was in fact no theft, Delta would nevertheless have the court conclude that the employee has no claim under the WDEA.

Relying on the Montana Supreme Court's decision in *Mysse v. Martens,* 279 Mont. 253, 926 P.2d 765 (1996), Delta argues that Marcy was required to prove that Delta's stated reason was pretextual. Delta contends that it had reasonable grounds to believe that Marcy acted intentionally in submitting mistaken payroll records, and that it acted in good faith in discharging her for that reason. Because Marcy failed to demonstrate that Delta's stated reason was a pretext for some other illegitimate reason, Delta asks this court to reverse the district court's denial of its motion for judgment as a matter of law, or in the alternative, to grant Delta a new trial. To hold otherwise, Delta argues, would allow juries to second guess employers' day-to-day termination decisions.

A. *The Montana Wrongful Discharge From Employment Act*

Under the WDEA, an employee may assert a cause of action against a former employer where the employee's "discharge was not for good cause and the employee had completed the employer's probationary period of employment." Mont.Code Ann. § 39-2-904(2). The WDEA further defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." *Id.* § 39-2-903(5).

At the time of her discharge, Marcy was not a probationary employee, and the parties

stipulated that Marcy was generally rated as an outstanding employee. Thus, this appeal involves only whether Delta terminated Marcy for "[a] legitimate business reason." The WDEA, unfortunately, does not further define what constitutes a "legitimate business reason." Recognizing the need to clarify this term, the Montana Supreme Court stated that "a legitimate business reason is a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Buck v. Billings Montana Chevrolet, Inc.,* 248 Mont. 276, 811 P.2d 537, 540 (1991).

At the outset, we note that a plain reading of the WDEA does not require a plaintiff to demonstrate an employer's bad faith through the existence of a pretext.[1] The Montana Supreme Court has stated, "[w]here the language of a statute is clear and unambiguous, we look no further than to the plain meaning of the statute for its interpretation." *State v. Long,* 274 Mont. 228, 907 P.2d 945, 950 (1995). Thus, as a matter of statutory construction, we would agree with the district court that "[t]he statute is clear on its face. . . . Pretext is not a part of the statute and should not be made so by judicial fiat."[2]

A review of the WDEA's sparse legislative history also does not clearly indicate whether the Montana legislature intended to require discharged employees to demonstrate an employer's bad faith to state a valid claim under the WDEA. *See Buck,* 811 P.2d at 540. The rejection of a proposed amendment to the WDEA, however, provides support for the reading that the Montana legislature did not intend for the WDEA to have such a requirement. In an early draft of the WDEA, the

---

1. Section 904 provides in full:

   A discharge is wrongful only if:
   (1) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
   (2) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
   (3) the employer violated the express provisions of its own written personnel policy.
   Mont.Code Ann. § 39-2-904. Section 903(5) further provides:
   "Good cause" means reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of

the employer's operation, or other legitimate business reason.
   Mont.Code Ann. § 39-2-903(5).

2. The dissent criticizes the majority for "reading clarity into Montana law where there is none." Despite the dissent's offer of "two possible interpretations" of the WDEA, the dissent cannot escape the fact that pretext is nowhere mentioned in the Act. Further, as demonstrated below, the attempt by the dissent and Delta in reading ambiguity into the WDEA from the pretext language in *Mysse* fails. In the end, it seems that it is the dissent that is reading ambiguity into Montana law where there is none.

Montana Senate Judiciary Committee proposed adding the following sentence to the definition of good cause: " 'Good cause' means a fair and honest cause or reason regulated by *good faith* on the part of the employer in his decision to terminate an employee. Managerial discretion must be taken into consideration by the trier of fact in applying the 'good cause' standard." Hearings on H.B. 241 Before the Montana Senate 1995 Legislature Judiciary Comm., Exhibit 8 at 1, 50th Legislature Regular Session (1987) (emphasis added). The Committee explained that with this language, "the employer's interest in management discretion would be protected by allowing business to make employment decisions for business reasons." *Id.*, Exhibit 7, at 2–3. This language was never adopted as the final version of the WDEA. The rejection of this amendment supports the conclusion that the Montana state legislature was unwilling to allow employers to escape liability by virtue of acting in good faith.

B. *Montana Supreme Court Cases Interpreting the WDEA*

Although neither the plain language of the WDEA nor its legislative history supports Delta's pretext requirement, Delta relies on the Montana Supreme Court's decision in *Mysse v. Martens*, 279 Mont. 253, 926 P.2d 765 (1996), where the court stated:

In order to defeat a motion for summary judgment on the issue of good cause, this court requires the employee to prove that the given reason for the discharge ... *is a pretext and not the honest reason* for the discharge.

*Mysse*, 926 P.2d at 770 (emphasis added). Delta argues that this language requires Marcy to prove that Delta's stated reason for her discharge was pretextual. We agree with the district court that Delta places too much significance on the Montana Supreme Court's use of the word "pretext."

■ A close review of the WDEA case law reveals that the Montana Supreme Court will find that the stated reason for an employee's discharge is not legitimate under the WDEA if the reason given for the employee's discharge: (1) is invalid as a matter of law

under the WDEA; (2) rests on a mistaken interpretation of the facts; or (3) is not the honest reason for the discharge, but rather a pretext for some other illegitimate reason. A discharged employee need only prove that one of these three types is true in her case to demonstrate that the reason for her discharge was not legitimate.

■ Thus, contrary to Delta's argument, proof that the employer acted in bad faith by using a pretext to discharge its employee is only one possible way of demonstrating that the employer's stated reason was not a legitimate one. All the Montana Supreme Court cases that have interpreted the WDEA are consistent with this reading.

1. *The Stated Reason May be Invalid on Its Face*

Although it has addressed this issue several times, the Montana Supreme Court has not yet held that an employer's given reason for an employee's discharge was invalid as a matter of law under the WDEA. This result is unsurprising, however, because an employer is unlikely ever to offer such a reason for discharging an employee.

A discussion of this issue was presented in *Buck, supra.* Plaintiff James Buck was employed by Frontier Chevrolet as the manager of its car dealership, and was considered to be an exemplary employee. *Buck*, 811 P.2d at 540. After Frontier was purchased by F.S. Enterprises ("FSE"), FSE discharged Buck "in compliance with a long standing policy of [FSE] ... which placed long term employees in charge of the new dealership." *Id.* at 539. Buck did not allege that the reason given for his discharge was pretextual or based on a mistaken interpretation of facts; he only challenged whether FSE's policy was a valid business reason on its face under the WDEA. Buck appealed the trial court's grant of summary judgment to FSE.

The Montana Supreme Court affirmed the grant of summary judgment, holding that where an employer seeks to fill "sensitive managerial or confidential positions," it may properly look to its own employees. *Id.* at 541. The policy used by FSE would allow FSE to place people in those positions who

hold the same "business values and philosophies" as itself, and also reward its long term employees. *Id.* The Court determined that because Buck failed to demonstrate that FSE's reason for discharging him was invalid on its face, and further "has not come forward with any evidence showing bad faith or falsehood, we hold summary judgment was properly awarded." *Id.* at 541. In other words, once the Montana Supreme Court determined that Buck had failed to demonstrate that the reason for his discharge was not a legitimate business reason, Buck no longer had a valid claim under the WDEA.

### 2. *The Reason Given May be Based on Mistaken Facts*

The second type of case where the Montana Supreme Court has found that the reason for discharge is not legitimate is if the reason given is based on a mistaken interpretation of the facts. The Montana Supreme Court has repeatedly found that an employee discharged for a reason based on a mistaken interpretation of the facts has a valid claim under the WDEA, even if the employer acted in good faith.

*Morton v. M–W–M, Inc.,* 263 Mont. 245, 868 P.2d 576 (Mont.1994) presented the Montana Supreme Court with facts strikingly similar to this case. Morton worked as an assistant manager for Burger King, and requested and received vacation time so that she could take care of her children, but instead went to work at a second job for another restaurant, Black Angus. *Id.* at 578. Although she was generally rated as an exceptional employee, Burger King terminated her, claiming that she had violated company policy by going to work for a competitor, failing to make herself available for part-time work during her vacation, and for being dishonest about her vacation plans. *Id.*

Morton did not dispute that she had gone to work for Black Angus, but denied that she had lied about it. Morton argued that Black Angus was not a competitor of Burger King, and that while she originally intended to use her vacation to take care of her children, she was ultimately able to find a babysitter, and only then did she interview for the position at Black Angus. *Id.* The Montana Supreme Court reversed the trial court's grant of summary judgment to Burger King.

The Montana Supreme Court stated that material issues of fact still existed as to *"whether Morton misled her employer* to obtain vacation time to work for a second job." *Id.* at 580 (emphasis added). In other words, Burger King fired Morton for being dishonest about her work plans, and Morton had sufficiently demonstrated that there was a triable issue of fact whether Burger King was *mistaken.* There was no discussion of pretext because proof of pretext was unnecessary. Morton had sufficiently raised a factual question whether the reason given for her discharge was not legitimate because it was based on a mistaken interpretation of the facts.

Importantly, the court did not frame the issue as whether Burger King had *good reason* to think that Morton had misled Burger King, or whether Burger King had acted in *good faith* in relying on the facts then known to it. Rather, the court's focus was on the factual issue of Morton's intent, regardless of whether Burger King was justified in reaching its decision to terminate Morton. Under Delta's reasoning, the exact opposite would be true—the focus would be on whether Burger King had a good faith basis to believe that Morton lied, regardless of whether she did in fact lie.

In *Howard v. Conlin Furniture No. 2, Inc.,* 272 Mont. 433, 901 P.2d 116 (Mont. 1995), the Montana Supreme Court reaffirmed that the WDEA does not require the plaintiff to demonstrate that the employer acted in bad faith to state a valid cause of action. The plaintiff, Howard, worked as a manager of a Conlin furniture store, but was fired for alleged deficiencies in his job performance. *Id.* at 118. At trial, Howard argued that while the factual basis of the allegations were true, there was an innocent explanation for each alleged deficiency. For example, he admitted that he was absent an excessive amount of time, but contended that his absences were related to store business. *Id.* at 120. The employer also claimed that Howard loaned out a company vehicle which was then damaged while being used by a third party, but Howard explained that he

was only acting pursuant to the company's policy of assisting others to build public relations. *Id.*

The trial court granted the employer's motion for summary judgment, finding that "[the employer] offered evidence of reasonable job related grounds for [termination], and that Howard's alleged reasons were conclusory and speculative."[3] *Id.* at 118 (emphasis added). The trial judge seemed to agree with Delta's position that an employer who acts in good faith in terminating an employee may do so without liability under the WDEA, regardless of whether the allegations the employer is relying upon turn out to be mistaken.

The Montana Supreme Court reversed, holding that Howard's "claims, denials, and counterclaims" regarding Conlin's allegations raised a factual issue whether Howard was terminated for good cause. *Id.* at 120. The court stated,

> where an employee testified that she had been hard working and loyal and had not received previous complaints from her employer about her management capability; and where she denied that the reasons given by her employer for her termination were correct; there was an issue of fact regarding whether she was terminated for good cause.

*Id.* at 120–21. Again, in reversing the grant of summary judgment to the employer, the court focused on whether the allegations and reasons provided by the employer were mistaken, not whether the employer acted in good faith or had used a pretext. Once Howard raised a genuine issue that the employer's reasons for discharging him were based on a mistaken interpretation of the facts, Howard had stated a valid cause of action under the WDEA.

### 3. *The Reason Given May Not Be the Honest Reason, But Rather a Pretext for Some Other Improper Reason*

The third type of case where a reason for discharge is not legitimate under the WDEA is if that reason is merely a pretext for some

other illegitimate reason. Delta relies heavily on two Montana Supreme Court cases, *Mysse v. Martens*, 279 Mont. 253, 926 P.2d 765 (1996), and *Cecil v. Cardinal Drilling Co.*, 244 Mont. 405, 797 P.2d 232 (1990), as support for its pretext argument. The facts of both cases reveal, however, that the Montana Supreme Court refers to pretext in these cases only because the plaintiffs in both cases failed to show that their employer's given reason for terminating them was either based on a mistaken interpretation of the facts or invalid as a matter of law.

In *Mysse*, the plaintiff, a driver for the county who used her own vehicle, was ordered to drive a new bus purchased by the county, but she refused. *Mysse*, 926 P.2d at 768. Even though she was given repeated warnings that she would be fired for disobeying the order, she continued to refuse to drive the county bus. *Id.* At trial, the plaintiff alleged that she was discharged because she was being made a "scapegoat" for the county's improvident decision to buy the bus in the first place. *Id.* at 771.

Importantly, Mysse never claimed that her refusal to do her job and drive the new bus was not a legitimate business reason for the county to discharge her. Further, she did not claim that the county's reason rested on a mistaken interpretation of the facts, i.e., that she was in fact willing to drive the bus. Instead, Mysse's claim was that the county used her refusal to drive the county bus as merely a pretext to discharge her for an illegitimate reason—making her a scapegoat. Thus, Mysse's whole claim rested on her ability to prove that the county terminated her to make her a scapegoat. Accordingly, the Montana Supreme Court stated that for Mysse "to defeat a motion for summary judgment on the issue of good cause, this Court requires [her] to prove that the given reason for the discharge, such as failure to perform the services the employee was hired to perform, is a pretext and not the honest reason for the discharge." *Id.* at 770. In other words, it was incumbent upon Mysse to prove pretext only because she rested her

---

**3.** Although Howard was not discharged, but was offered a demotion, the Montana Supreme Court nevertheless found that the demotion was a

"constructive discharge." *Howard*, 901 P.2d at 119.

entire wrongful discharge claim on the existence of a pretext. *Mysse* does not hold that a plaintiff must always prove pretext in all cases under the WDEA.

Delta argues that *Cecil* also supports the requirement that the plaintiff prove bad faith through a showing of pretext. Donald Cecil was terminated after a fall in oil prices reduced the revenues of his employer, Cardinal. Cecil argued that his employer did not "act fairly or honestly when claiming 'economic necessity' . . . as the reason for his termination." *Cecil*, 797 P.2d at 235. Specifically, Cecil challenged his employer's decision to discharge him by arguing that the fall in oil prices did not *require* that he be discharged, and that in any event, an economic downturn was not a legitimate reason for discharging him. In other words, Cecil claimed that Cardinal's reason was not legitimate for two reasons: (1) it was based on a mistaken interpretation of the facts; and (2) it was invalid as a matter of law.

In affirming the trial court's grant of summary judgment to the employer, the Montana Supreme Court stated that "Cecil did not offer any *other motive or reason* for his termination. He merely denied that the reasons were legitimate business reasons." *Id.* (emphasis added). We find that Delta reads too much into the Montana Supreme Court's discussion of pretext.

The Montana Supreme Court quickly disposed of Cecil's claim that the fall in oil prices was not a valid reason to discharge Cecil. "It is well-settled in the case law prior to the [WDEA] that economic conditions constitute a 'legitimate business reason.'" *Id.* at 234. The Court next addressed Cecil's "mistake" argument. The Court held that while Cecil did offer some evidence tending to show that it was *"possible"* for his employer to keep him employed despite the economic downturn, Cecil had not offered sufficient evidence to raise a triable issue that Cardinal was mistaken in discharging Cecil out of economic necessity.

Cecil failed to raise a triable issue on either of his claims. The Court's discussion of pretext merely reflects the fact that, had Cecil offered sufficient evidence that Cardinal had acted in bad faith, Cecil's claim would

have survived summary judgment. Absent such evidence, however, the Montana Supreme Court was unwilling to "speculate as to what Cardinal's real reasons may have been if they were in fact not as claimed." *Id.* Of course, had Cecil offered sufficient evidence to raise a triable issue whether Cardinal's reason was invalid as a matter of law, or whether it rested on a mistaken interpretation of the facts, a discussion of pretext would have been unnecessary.

### C. *Suzanne Marcy's Claim*

Marcy claimed that Delta's reason for terminating her—intentional falsification of payroll records—rested on a mistaken interpretation of the facts. She did not allege that such a reason was invalid under the WDEA, or that Delta had acted in bad faith by using that reason as a pretext for some other illegitimate reason. Thus, once Marcy offered sufficient evidence to raise a genuine issue of material fact that her recording errors were unintentional, the case properly went before a jury to determine that factual issue. *See Morton*, 868 P.2d at 580. Marcy was not required to prove that Delta had acted in bad faith because that issue was irrelevant to whether Delta was mistaken.

■ Marcy raised a genuine issue of fact on whether she acted intentionally. Before her discharge, she was generally rated as an outstanding employee, and she offered evidence that mistakes were common in Delta's payroll system. Further, she offered evidence that Delta supervisors would consult employees about any discrepancies between the DAR and DWS. Whether Marcy intentionally entered mistaken payroll entries on her DAR squarely presented a factual issue for the jury, which found in favor of Marcy, and on appeal Delta does not challenge that verdict as against the weight of the evidence.

Because we hold that Marcy was not required to prove that Delta's stated reason for her discharge was pretextual, we conclude that the district court did not err in denying Delta's motion for judgment as a matter of law, or alternatively, for a new trial. Because we affirm the district court on these grounds, we decline to reach the district

court's alternative bases for denying Delta's motions.

AFFIRMED.[4]

GRABER, Circuit Judge, dissenting:

I respectfully dissent, because the majority has departed from proper methods of statutory construction and has created an opportunity for forum-shopping in Montana wrongful termination cases.

First, the majority uses an improper method of statutory interpretation when it relies on a proposed legislative amendment that failed, Op. at 1283–84, as a means to interpret the law that survived unchanged. There are many reasons why a proposed amendment fails. Some legislators may believe that the amendment is unnecessary, because the statute already means the same thing; some may oppose the amendment on the merits; some simply may be absent and not voting "aye." As a matter of logic, we gain no information from what a given statute did not become. *See Bankers Life & Cas. Co. v. Peterson*, 263 Mont. 156, 866 P.2d 241, 244 (1993) ("[T]he legislature's failure to enact a proposed amendment is of little value in interpreting legislative intent because an amendment may be defeated for many reasons."); *In the Matter of W.J.H.*, 226 Mont. 479, 736 P.2d 484, 487 (1987) (same).

My second difference with the majority concerns its interpretation of Montana law. By reading clarity into Montana law where there is none, the majority invites forum-shopping for parties who have a choice.

The Montana Wrongful Discharge from Employment Act (WDEA) permits an employee to maintain a successful action for wrongful discharge *"only if . . . the discharge was not for good cause."* Mont.Code Ann.

§ 39–2–904(2) (emphasis added). " 'Good cause' means reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Mont.Code Ann. § 39–2–903(5). The Montana Supreme Court has defined "legitimate business reason" to mean a reason that has "some logical relationship to the needs of the business" and is "neither false, whimsical, arbitrary or capricious." *Buck v. Billings Montana Chevrolet, Inc.*, 248 Mont. 276, 811 P.2d 537, 540 (1991). The question in this case is: When an employer conducts a proper investigation and, at the time it acts, fires an employee for a reason that bears a "logical relationship to the needs of the business" that is not "whimsical," that is not "arbitrary," that is not "capricious," and that is not *then* known to be "false," has the employer fired a person for "good cause," or is it open to the employee to demonstrate after the fact that the reason given was erroneous?

The answer under the statutory terms, standing alone, is not entirely clear.[1] The statute provides that "[a] discharge *is* wrongful only if . . . the discharge *was* not for good cause." Mont.Code Ann. § 39–2–904(2) (emphasis added). Although the statute's use of the past tense suggests that the wrongfulness of the termination must be examined at the moment of termination, the statute is silent as to whether a plaintiff must prove "falsity" by showing that the reason given for termination was a pretextual one or was based on an incorrect assessment of the underlying facts.

Keeping in mind those two possible interpretations, the nature of a wrongful dis-

---

**4.** The dissent disagrees with the jury's finding that Marcy did not intend to defraud Delta, although Delta quite properly does not challenge that the verdict was supported by the evidence. The dissent also criticizes the majority's reference to the Montana legislature's rejection of an amendment to the WDEA, although the Montana courts have relied on this rule in the past. *See, e.g., Weis v. Div. Of Workers' Compensation of Dept. of Labor & Indus.*, 232 Mont. 218, 755 P.2d 1385, 1387 (1988). Further, while it is true that the Montana legislature limited the tort damage liability of employers, nothing in the Act limited

the basis of that liability. In any event, and of more importance, the majority position is supported by the plain language and Montana Supreme Court opinions discussed in detail by the majority opinion, and nowhere distinguished by the dissent. In view of the authoritative decisions, we see no reason to delay with certification of an issue to the Montana Supreme Court.

**1.** For this reason, the principle that a Montana court looks to the plain meaning of a statute when its terms are clear, Op. at 1283, has no application.

charge claim under Montana law suggests that the plaintiff must make the tougher showing of pretext to establish a successful claim under the statute. The Montana Supreme Court has given us a blueprint for how to resolve uncertainties in the wrongful discharge statute. In *Meech v. Hillhaven West, Inc.*, 238 Mont. 21, 776 P.2d 488, 504 (1989), the court discussed a central feature of the legislation—its limit on the damages available to a successful employee-plaintiff. Unlike prior common law, the statute precludes, in a case such as the present one, damages for pain and suffering, damages for emotional distress, compensatory damages, punitive damages, and any lost pay and fringe benefits for more than four years. *Id.* (citing Mont.Code Ann. § 39–2–905). In examining that feature of the statute, the court observed that the genesis and purposes of the WDEA were pro-employer, not pro-employee:

> The legislative history of the Act demonstrates that lawmakers perceived an unreasonable financial threat to Montana employers from large judgments in common-law wrongful discharge claims. Testimony in legislative hearings also indicated to legislators that large judgments in common-law wrongful discharge cases could discourage employers from locating their businesses in Montana. The Act's limitation on damages is intended to alleviate these threats.... [P]romoting the financial interests of businesses in the State or potentially in the State to improve economic conditions in Montana constitutes a legitimate state goal.

*Id.* at 504. The court further noted that another legitimate legislative aim was to provide "for greater certainty in defining an employer's duties." *Id.* at 505. In sum, the Montana Supreme Court has held that the legislature's main aims in enacting the WDEA were (1) to provide for greater certainty in defining an employer's duties toward its employees and (2) to reduce employers' liability in wrongful discharge cases. *See also Kestell v. Heritage Health Care Corp.*, 259 Mont. 518, 858 P.2d 3, 7 (1993) (observing that, in pre-WDEA cases, it was well settled that "courts should not intrude in the day-to-day employment decisions of busi-

ness owners"). The majority's interpretation of the statute is at odds with both aims.

Moreover, although the answer under Montana precedent is not entirely clear, precedent weighs against the majority's understanding of the WDEA. The Montana Supreme Court has stated recently: "In order for an employee to defeat a motion for summary judgment on the issue of good cause, this Court requires the employee to prove that the given reason for the discharge, such as failure to perform the services the employee was hired to perform, is *a pretext and not the honest reason for the discharge.*" *Mysse v. Martens*, 279 Mont. 253, 926 P.2d 765, 770 (1996) (emphasis added). The majority seeks to minimize the importance of that holding, but the Montana court's statement is plain, and it is consistent with other decisions as well. *See, e.g., Kestell*, 858 P.2d at 8 (an employee can prevail under the WDEA if the employee "presents evidence, and not mere speculation or denial, upon which a jury could determine that *the reasons given for his termination were false,* arbitrary or capricious, and unrelated to the needs of the business") (emphasis added); *Cecil v. Cardinal Drilling Co.*, 244 Mont. 405, 797 P.2d 232, 235 (1990) ("[The plaintiff] did not offer any other motive or reason for his termination. He merely denied that the reasons were legitimate business reasons."); *Koepplin v. Zortman Mining, Inc.*, 267 Mont. 53, 881 P.2d 1306, 1310 (1994) ("Since Defendant has the right to serve its own legitimate business interest in discharging the Plaintiff, the proper focus of the inquiry should not be on whether Plaintiff's attorney characterizes [Plaintiff's] statement as a threat, but whether the statement was heard as a threat by [Defendant's employee]."). Those cases suggest that "false reason" within the meaning of *Buck* is to be considered as of the time of the termination itself and that it is insufficient for the plaintiff to prove "falsity" merely by showing later that her version of the facts is more believable than not by a preponderance of the evidence.

The facts of this case reveal the disquieting prospect of a court's second-guessing of employers' day-to-day personnel decisions, a prospect that is inherent in the majority's

**1290**

interpretation of the Montana statute. Here, defendant fired plaintiff for recording false time-sheet entries. Those entries claimed 14.5 hours of time that plaintiff had not worked; those hours, of course, would have translated into unearned wage payments. Plaintiff does not dispute that the entries were wrong. She does not claim that, in general, a firing for recording false time-sheet entries fails the "legitimate business reason" test established by the Montana statute. Plaintiff does not claim and did not prove that defendant fired her for some illegitimate reason or had any ulterior motive. Finally, and significantly, plaintiff did not prove that defendant failed to follow proper procedures in investigating or carrying out the termination.[2] To the contrary, it is undisputed that defendant provided plaintiff with an opportunity to explain the false time-sheet entries. When she only said that she had made a "big mistake," defendant discharged her. Defendant's decision not to believe plaintiff's story was reasonable in the light of the fact that, on a prior occasion, plaintiff had admitted to falsifying company telephone logs. In these circumstances, I do not think that Montana law permits a jury to second-guess defendant's decision to fire plaintiff by deciding that it would have credited her "big mistake" explanation.

At best, the majority's interpretation of Montana law is plausible. Nonetheless, at a minimum, a different interpretation of "good cause," Mont.Code Ann. §§ 39-2-903(5), 39-2-904(2), is equally plausible. In the circumstances, I would decline to guess at the meaning of Montana law and would submit a certified question to the Montana Supreme Court.

---

**2.** By the time of trial, the district court already had dismissed plaintiff's claim that defendant had violated its own written personnel policy, Mont.Code Ann. § 39-2-904(3), and that decision is not before us on appeal.