NO. 93-147

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

JOHN KESTELL,

    Plaintiff and Respondent,

-vs-

HERITAGE HEALTH CARE CORPORATION,
d/b/a GLACIER VIEW HOSPITAL,
a Washington corporation, STERLING
CORPORATION, d/b/a GLACIER VIEW
HOSPITAL,

    Defendants and Appellants.

APPEAL FROM:   District Court of the Eleventh Judicial District,
               In and for the County of Flathead,
               The Honorable Michael H. Keedy, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Daniel W. Hileman; Murray & Kaufman, Kalispell
            Montana

        For Respondent:

            Elizabeth A. Best, Attorney at Law, Great Falls,
            Montana

FILED

AUG 10 1993

Filed:

CLERK
STATE OF MONTANA

Submitted on Briefs:  June 1, 1993

Decided: August 10, 1993

'Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

Heritage Health Care Corporation and its owner, Sterling Corporation, doiny business as Glacier View Hospital in Kalispell, Montana, appeal from judgment on a jury verdict in the Eleventh Judicial District Court, Flathead County. The jury found that the appellants (collectively, the hospital) wrongfully discharged the respondent John Kestell (Kestell). We affirm.

The following issues are raised on appeal:

1. Did the District Court err in denying the hospital's motions for directed verdict and judgment notwithstanding the verdict on Kestell's wrongful discharge claim?

2. Did the District Court err in allowing a proposed release into evidence?

3. Did the District Court err in instructing the jury?

4. Were the damages awarded by the jury excessive as a matter of law?

In September 1989, Jerry Wetherbee, a Sterling Corporation officer, and Brent Porges, administrator of Glacier View Hospital, offered Kestell a position as director of the hospital's chemical dependency unit. He had been working as an inpatient supervisor at Rimrock Foundation in Billings, Montana, but had accepted a new position with a similar facility in Roseburg, Oregon. Porges and Wetherbee persuaded Kestell to change his plans and come to Kalispell by increasing their salary offer and promising ninety days notice of any termination during Kestell's first year of employment.

Kestell testified that he was hired to increase the number of

2

patients in the chemical dependency unit, in part by expanding its services to include addictive disorders other than chemical dependency. He began work at Glacier View Hospital on September 25, 1989, under an employment agreement that established his base pay at $3,583.34 per month and provided for quarterly bonuses based on the number of paying patients in the chemical dependency unit. The agreement also included a reciprocal ninety-day notice provision.

Porges evaluated Kestell's performance in March 1990, at the end of his six-month probationary period. In his report Porges praised Kestell's marketing efforts and his commitment to his patients and to quality treatment, and he noted approvingly that Kestell had "opened up the patient environment" by allowing chemical dependency patients the freedom to mix with psychiatric patients. Although he indicated that Kestell "needed improvement" in several areas, Porges did not rate his performance as unsatisfactory in any of the twelve areas listed.

Two months later, on June 12, 1990, Wetherbee and Porges told Kestell that his position had been eliminated and that another job would be found for him. At a staff meeting the same day, Kestell learned that the hospital had entered into an agreement with Health Management Corporation (HMC), which provided that HMC would assume full management responsibility for the chemical dependency unit. Kestell was told that he would be replaced as director by HMC's employee and, in fact, HMC's employee, Mike DuHoux, began work as director of the chemical dependency unit on or about July 1, 1990.

3

Soon after June 12, 1990, Kestell was moved to a **"group** room" in the **psychiatric** wing of the hospital so that his former office in the administrative wing could be remodeled for **DuHoux.** Kestell testified that he was given a desk but no work assignments or responsibilities, and that he was expected to leave the room when group therapy sessions were scheduled.

Wetherbee suggested that Kestell apply for one of the counseling jobs vacated when HMC took over the chemical dependency unit, but Kestell refused. He testified that his salary as director of the unit had been approximately $48,000 per year, including bonuses, while the counselor position would have paid approximately $25,000; that he had had no recent experience in daily counseling; and that the offer was a **"humiliation."**

Wetherbee also offered Kestell an opportunity to apply for a marketing job with Sterling Corporation, but Kestell testified that he could not afford to consider this because it would have meant relocating to Idaho. He already owned houses in Billings and Kalispell and was unwilling to move his children a second time in the same year.

**On** June 29, 1990, Porges sent Kestell a formal termination letter, referring to their employment agreement and stating that:

> [Y]ou will be relieved of your duties as [chemical dependency] program director as of July 1, 1990. As we agreed, your base salary will remain the same for 90 days. . . . Though you should consider this letter as your 90 day notice per agreement, we will continue to honor our agreement to work with you, the new Director and the Management Consultant Team, to negotiate an acceptable position with the [chemical dependency] program.

4

In response, Kestell wrote to Porges, reminding him that his performance as director had been an asset to the hospital and stating that he had been offered a lower position with less responsibility and respect. He warned the hospital that if it did not reinstate him, he would pursue legal remedies under the Montana Wrongful Discharge from Employment Act.

Kestell continued to spend eight hours at his desk in the psychiatric unit every day, five days a week, until July 18, 1990. On that day Porges showed him a letter from the hospital's lawyer, dated July 13, 1990, which expressed the opinion that Kestell had not been wrongfully discharged because his position had been eliminated. Kestell testified that he read this letter as an expression of bad faith on the part of the hospital administration and immediately left the premises. The hospital continued to pay his base salary through September 1990.

Kestell soon found a marketing position with the Rocky Mountain Treatment Center in Great Falls, but he could not afford to move and was forced to commute from Kalispell on a daily or weekly basis. He was laid off eight months later and subsequently opened a private practice in Kalispell. At the time of the trial in December 1992, he was making approximately $1,200 a month in his private practice and $600 a month as executive director of a low-income counseling facility in Kalispell.

Kestell filed a wrongful discharge complaint in November 1990, seeking award of wages and fringe benefits for four years from the date of discharge. The hospital admitted in its answer that

Kestell had been relieved of his duties as director of the chemical dependency unit but denied that he had been discharged, alleging instead that Kestell's position had been eliminated pursuant to the hospital's contract with HMC.

Kestell amended his complaint in July 1991 to join HMC and its two shareholder-directors individually, alleging that HMC or its directors had tortiously interfered with his employment contract: intentionally or negligently inflicted severe emotional distress; and acted with actual fraud or actual malice. HMC and its directors immediately moved to dismiss Kestell's claims against them.

The hospital moved for summary judgment in August 1991. It argued that its employment agreement with Kestell ended when it contracted with HMC for management of the chemical dependency unit, and that no discharge had occurred because Kestell resigned before the ninety-day notice period had expired.

The District Court denied both motions. It determined that genuine issues of material fact existed as to whether Kestell quit: whether his position was eliminated; whether DuHoux served in the same capacity: and whether the hospital had a legitimate business purpose in contracting with HMC. It also determined that the individual liability of HMC's directors was a genuine issue of material fact because HMC had not filed its articles of incorporation when its directors signed the contract with the hospital.

The jury trial began on November 30, 1992. After three days

6

of testimony, the jury returned a special verdict, finding that the hospital had wrongfully discharged Kestell and awarding damages in the amount of $123,600. The jury also found that HMC and its directors did not tortiously interfere with Kestell's employment contract or intentionally inflict emotional distress. The hospital appealed. Because Kestell did not cross-appeal, HMC and its directors are not involved in this appeal.

I

Did the District Court err in denying the hospital's motions for directed verdict and judgment notwithstanding the verdict on Kestell's wrongful discharge claim?

The hospital moved for a directed verdict during the trial and, later, for judgment notwithstanding the verdict. The District Court denied both motions on the ground that the evidence was sufficient for the jury to find that Kestell was wrongfully discharged.

In considering a motion for a directed verdict or for judgment notwithstanding the verdict, the district court must view the evidence in a light most favorable to the non-moving party. A motion for directed verdict must be denied if there is any evidence that warrants submission to the jury. Wilkerson v. School District No. 15, Glacier County (1985), 216 Mont. 203, 211, 700 P.2d 617, 622. A motion for judgment notwithstanding the verdict must be denied if it appears that the non-moving party can recover upon any view of the evidence, including legitimate inferences to be drawn from it. Larson v. K-Mart Corp. (1990), 241 Mont. 428, 433, 787

7

P.2d 361, 364.

The hospital contends, on appeal, that the evidence did not warrant submitting the wrongful discharge issue to the jury. It supports this contention by arguing first, that Kestell was not discharged at all, and second, that if he was discharged, it was for legitimate business reasons. We will address each of these contentions separately.

Constructive Discharge

To prevail on a wrongful discharge from employment claim, an employee must establish that he or she was discharged and that the discharge was wrongful. Montana Wrongful Discharge from Employment Act, §§ 39-2-901, et seq., MCA. Under § 39-2-903(2), MCA, "discharge" includes resignation, layoff, job elimination and constructive discharge, which is defined in § 39-2-903(1), MCA, as

> the voluntary termination of employment by an employee because of a situation created by an act or omission of the employer which an objective, reasonable person would find so intolerable that voluntary termination is the only reasonable alternative.

Kestell has proceeded on a constructive discharge theory from the outset. The hospital argues that he was neither actually nor constructively discharged, because he was told when his position was eliminated that he would be given a job within the organization. From the hospital's point of view, Kestell simply quit, without waiting for the hospital to negotiate an acceptable position for him.

The hospital contends that constructive discharge cannot apply here because this Court has recognized it only in cases where the

8

plaintiff belonged to a protected class or had been criminally prosecuted by the employer. In neither of the two cases relied on to support this contention, however, did we hold that constructive discharge was limited to the factual scenario in the case. Snell v. Montana-Dakota Utilities Co. (1982), 198 Mont. 56, 643 P.2d 841; Niles v. Big Sky Eyewear (1989), 236 Mont. 455, 771 P.2d 114.

Moreover, the Wrongful Discharge Act clearly controls the case now before us. Nothing in its definition of constructive discharge, quoted above, indicates that the legislature intended to limit its application to protected classes or to instances in which the employee was criminally prosecuted.

In Snell and Niles, both pre-Act cases, we defined constructive discharge essentially as it is now defined in the Act. We held in those cases, as we hold here, that to determine whether an employee has been constructively discharged, the fact finder must decide whether the employer has rendered working conditions so intolerable that resignation is the only reasonable alternative. Niles, 771 P.2d at 118. A determination of constructive discharge "depends on the totality of circumstances, and must be supported by more than the employee's subjective judgment that working conditions are intolerable." Snell, 643 P.2d at 846.

Here, credible evidence in the record shows that Xestell, a highly qualified professional and experienced supervisor, was abruptly removed from his post, isolated in a different wing of the hospital, and deprived of meaningful activity. He testified that other employees began to treat him as a "non-person," looking the

9

other way when he approached and refusing to acknowledge his presence. It is undisputed that he was not offered a comparable position, but only an opportunity to apply for a job that he had previously supervised.

We conclude that the record, viewed in a light most favorable to Kestell, contains sufficient evidence for the jury to determine that the hospital rendered Kestell's working conditions intolerable. The District Court, therefore, did not err in submitting the constructive discharge question to the jury.

Legitimate Business Reasons

Under the Wrongful Discharge Act, discharge of a post-probation employee such as Xestell is wrongful if it is not for good cause. The Act defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties . . . or other legitimate business reason." Section 39-2-903(5), MCA. Testimony by Wetherbee and the hospital personnel manager established that Kestell was not terminated for unsatisfactory performance. The issue, therefore, is whether Kestell's termination was justified by a legitimate business reason.

In Buck v. Billings Montana Chevrolet, Inc. (1991), 248 Mont. 276, 281-82, 811 P.2d 537, 540, we defined "legitimate business reason" as "a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." We applied this definition to a wrongful discharge action brought by the former general manager of an

10

automobile dealership. When the dealership was sold, the buyer replaced the plaintiff with one of its own long-term employees. The plaintiff did not assert that the stated reasons for replacing him were false, merely that his dismissal was not justified under the Act.

We upheld summary judgment for the defendants in **Buck** because the plaintiff failed to demonstrate that the new owner did not have a legitimate business reason for replacing him. Under the facts before us, the new owner's decision to install one of its own people as manager was not false, whimsical, arbitrary or capricious, and it had a logical relation to the needs of the business. To conclude otherwise, we said, "would be to force a new owner of a business to retain someone it did not know or perhaps even trust to manage a large dollar investment." _Buck_, 811 **P.2d** at 541.

Similarly, we upheld summary judgment for the employer in Cecil v. Cardinal Drilling Co. **(1990)**, 244 Mont. 405, 797 **P.2d** 232, because there was no genuine dispute over the fact that the plaintiff was terminated for a legitimate business reason, that is, the declining price of crude oil. Our rationale was that employers should not be foreclosed from engaging in legitimate reductions in force necessary to maintain the company's economic vitality. _Cecil_, 797 **P.2d** at 234.

It is well-settled in our pre-Act cases that courts should not intrude in the day-to-day employment decisions of business owners. See, e.g., Coombs v. Gamer Shoe Co. **(1989)**, 239 Mont. 20, 778 **P.2d**

11

885; Hobbs v. Pacific Hide and Fur Depot (1989), 236 Mont. 503, 771 P.2d 125. An employer's legitimate right to exercise discretion over whom it will employ must be balanced, however, against the employee's equally legitimate right to secure employment. Buck, 811 P.2d at 540. The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business. Cecil, 797 P.2d at 235.

Here, the hospital terminated Kestell's employment to accommodate its contract with HMC, not to reduce its staff in response to declining revenues. Wetherbee testified that the primary reason for entering the contract with HMC was that it had a "substantial likelihood of improving the performance of the hospital." The hospital offers this need to improve performance as its legitimate business reason for eliminating Kestell's position.

The evidence demonstrates, however, that the hospital did not eliminate Kestell's position, but merely replaced Kestell with DuHoux. First, testimony at the trial established that DuHoux's job description was identical to Kestell's and that he received the same base pay. Second, HMC's two shareholder-directors, Ken Anderson and John Brekke, testified that neither of them supervised DuHoux's work at the hospital or evaluated the performance of any staff in the chemical dependency unit. DuHoux himself testified that he had a "dual responsibility" to HMC and the hospital administrator. Finally, DuHoux's personnel records and those of

12

his staff at the hospital were kept by the hospital administration, and his business card identified him as an employee of the hospital. HMC wrote DuHoux's paychecks, but Sterling Corporation issued bimonthly checks to HMC for the exact amount of DuHoux's salary until June 30, 1991, when HMC and the hospital terminated their agreement and DuHoux became a hospital employee.

The hospital offered no evidence to show that replacing Kestell with DuHoux was critical to its goal of enlarging its clientele. In fact, the evidence does not suggest any significant correlation between this replacement and the hospital's business needs.

DuHoux's qualifications were inferior to Kestell's, particularly in view of the hospital's November 1989 job description, which stated that an applicant with a graduate degree in counseling or human services would be preferred. DuHoux's formal education beyond a high school diploma consisted of thirty hours as a "generalist" in a junior college and a nine-month chemical dependency counseling program at the University of Minnesota: Kestell had a master's degree in counseling and psychology.

DuHoux had no experience as an inpatient supervisor before he replaced Kestell as director of the inpatient chemical dependency unit at Glacier View Hospital. He had worked three years as clinical director of a small treatment facility owned by John Brekke, which provided "adventure training" for chemically dependent male adolescents. DuHoux had worked there for three

13

**years** and had **fifteen years'** experience as a chemical dependency counselor elsewhere. Kestell had worked several years directing alcohol and drug programs for small agencies in Wisconsin and had five years' experience as an inpatient supervisor at **Rimrock** Foundation in Billings.

HMC shareholder-director Ken Anderson testified that HMC preferred DuHoux for the job, despite his lack of formal qualifications, because his "philosophical approach" was more congenial than Kestell's, and because replacing Kestell with DuHoux would **"make** Glacier View Hospital consistent with treatment in the valley.*' This apparently was a reference to the fact that Anderson and Brekke were both operating chemical dependency treatment facilities in the **Flathead** valley. According to Anderson, the most important philosophical difference between himself and Kestell was that Kestell believed in treating other addictions simultaneously with chemical dependency, which he and Brekke considered unethical. No evidence was offered to show that the hospital reasonably could have expected **HMC's** philosophical approach to attract more patients, and therefore more revenue, than had **Kestell's** approach.

In short, the record shows that the less qualified DuHoux simply assumed Kestell's position in the hospital, and that contrary to the hospital's allegations, the position was not eliminated or even substantially changed.

The legitimate business reasons that justified termination in Cecil and Buck are absent here. Unlike the employer in Cecil, the hospital terminated Kestell's employment to accommodate its new

14

contract with HMC, not to further a legitimate reduction in staff in response to declining revenues. In Buck, a new owner determined that it was necessary to put a trusted employee of long standing in charge of the operation; here, no new owner existed and the hospital replaced Kestell, whose performance had proved satisfactory, with an unknown individual who was arguably less qualified and less experienced.

In short, Kestell presented evidence demonstrating that the hospital's ostensible reasons for replacing him were false, arbitrary or capricious and unrelated to the needs of the business, and, therefore, that they did not constitute legitimate business reasons under § 39-2-903(5), MCA. We hold that the District Court did not err in denying the hospital's motions for directed verdict and judgment notwithstanding the verdict on Kestell's wrongful discharge claim.

II

Did the District Court err in allowing a proposed release into evidence?

The hospital contends that a release form presented to Kestell in August 1990 was inadmissible under Rule 408, M.R.Evid. Fuller, the hospital's business manager, asked Kestell to sign the document before he received his first severance paycheck. In pertinent part, it reads as follows:

> With reference to the August [actually September] 20th, 1989 agreement, I hereby give you notice of my decision to terminate prior to the 90 day notice period.
>
> The terms of my separation are that the hospital agrees to pay me 3 months salary as severance based on the date

15

> I was given notice, July 1, 1990. Severance will be paid
> in three monthly installments. The first installment is
> payable on signing of this release. . . .
>
> I agree to release the hospital from any and all other
> claims related to salary, bonuses and benefits. . . .

Rule 408, M.R.Evid., provides that evidence of offering or accepting valuable consideration in attempting to compromise a disputed claim is not admissible to prove liability for or invalidity of the claim or its amount. At the time Kestell was asked to sign this document, however, his claim for severance pay was not disputed; both parties had signed the September 1989 agreement providing for severance pay. Further, the document was not offered for the purposes prohibited by Rule 408, but rather to show that the hospital did not intend to find Kestell another position.

We conclude that the release form is not barred by Rule 408, M.R.Evid. and that the District Court did not abuse its discretion in admitting it into evidence.

### III

Did the District Court err in instructing the jury?

At Kestell's request, and over the hospital's objections, the District Court instructed the jury on tortious interference with contract, infliction of emotional distress, and piercing the corporate veil. On appeal, the hospital argues that the type of damages available and the duty to mitigate damages under these theories are substantially different from the damages and duty to mitigate under the wrongful discharge claim. Therefore, the hospital contends, Instructions 14 through 31 confused the jury and

16

jeopardized its right to a fair trial.

The disputed jury instructions clearly refer to Kestell's claims against HMC and its directors, not to his wrongful discharge claim against the hospital. Instruction 14, for example, begins:

> I will now instruct you on the law relating to [Kestell's] claim for damages as a result of the claims against Defendants Anderson, Brekke and **Health Management** Corporation for interference with his employment contract and infliction of emotional distress.

Kestell joined Anderson, Brekke and **HMC** as defendants without objection by the hospital: he clearly was entitled to jury instructions covering his claims against them. The special verdict form asked the jury to determine the hospital's liability separately from that of HMC and its directors, and to determine both liability and damages separately on each of Kestell's claims against HMC and its directors.

The jury discharged its duty, assessing damages against the hospital only for lost wages and benefits on Kestell's wrongful discharge claim. It found no liability on the part of HMC and its directors as to any of Kestell's claims against them. Nothing in the jury's response to the special verdict form suggests that it was in any way confused by the instructions. We conclude that the District Court did not err in giving Instructions 14 through 31.

IV

Were the damages awarded by the jury excessive as a matter of law?

The Wrongful Discharge from Employment Act provides that a successful plaintiff may be awarded lost wages and fringe benefits

17

for a period not to exceed four years from the date of discharge, plus interest. Interim earnings, "including amounts the employee could have earned with reasonable **diligence,"** must be deducted from the amount awarded for lost wages. Section **39-2-905(1),** MCA. The jury was instructed on the exact language of the statute.

The hospital contends that the jury's award of $123,600 in damages was excessive because Kestell had, "within days," accepted a job at Rocky Mountain Treatment Center for an annual salary of $36,000 and subsequently "decided to leave Rocky Mountain Treatment Center and enter private practice." The hospital infers that the jury must have ignored the instruction to deduct amounts Kestell could have earned with reasonable diligence.

On the contrary, the jury clearly took into account Kestell's testimony on interim earnings; otherwise, the award would have been higher. **Kestell's** undisputed testimony was that his annual earnings at the hospital, including bonuses and fringe benefits, would have **totalled** $57,600. He testified that Rocky Mountain Treatment Center paid him $3,000 per month until the end of 1990, then reduced his hours and paid him approximately $2,500 per month until April 1991, when he was laid off. During his first year in private practice, Kestell testified, he made **"two** or three thousand dollars, something like **that,"** and by the time of the trial in December 1992, approximately $1,800 a month. He expected to make $25,000 annually by the end of 1993. Presumably the jury took this testimony into account, for it reduced the maximum award allowed by the Act, i.e., $230,400, or $57,600 for each of four years, and

18

awarded only $123,600.

The Act provides that the trier of fact has discretion to determine the amount of lost wages and benefits, not to exceed four years from date of discharge. Weber v. State **(1992),** 253 Mont. 148, 153, 831 **P.2d 1359,** 1362. Here, the hospital has presented no evidence that the jury abused its discretion. We conclude that the damage award was not excessive as a matter of law.

Affirmed.

_____
                                Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices