2005 MT 21
DAVID G. COLE, Plaintiff, Respondent and Cross-Appellant,
v.
VALLEY ICE GARDEN, L.L.C., VALLEY ICE GARDEN MANAGEMENT, L.L.C., and WILLIAM MARTEL, Defendants and Appellants.
No. 03-729
Supreme Court of Montana.
Submitted on Briefs: February 1, 2005
Decided: February 9, 2005
For Appellants: Richard J. Andriolo, Esq., Andriolo & Refling PLLC, Bozeman, Montana; Donald C. Robinson, Esq. and Ronald A. Thuesen, Esq., Poore, Roth & Robinson, P.C., Butte, Montana.
For Respondent: Monte D. Beck, Esq., Beck, Richardson & Amsden, PLLC, Bozeman, Montana.
Justice Patricia O. Cotter delivered the Opinion of the Court.
¶ 1 Valley Ice Garden, L.L.C. and Valley Ice Garden Management, L.L.C. (hereinafter collectively referred to as VIG) and William Martel (Martel) appeal the judgment of the Eighteenth Judicial District Court, Gallatin County, that the termination of Plaintiff David G. Cole (Cole) as the hockey coach for the Bozeman Ice Dogs (the Ice Dogs) was without cause. We affirm in part and reverse and remand in part.

ISSUES
¶ 2 VIG presents the following issues on appeal:
¶ 3 1. Did the District Court err in concluding that Cole was terminated without cause?
¶ 4 2. Did the District Court err in concluding that a clause in the employment agreement which provided that Cole would receive one year's salary and a bonus if he was terminated without cause was a liquidated damages clause and was therefore void?
¶ 5 3. Did the District Court err in allowing Cole to assert a list of liquidated damages?
¶ 6 4. Did the District Court err in finding that the term of the employment agreement was for five years?
¶ 7 5. Did the District Court err in excluding evidence concerning the Immigration and Naturalization Services (INS) Visa status of Cole?
¶ 8 Cole raises the following issues on cross-appeal:
¶ 9 1. Did the District Court err in concluding that VIG did not breach the covenant of good faith and fair dealing?
¶ 10 2. Did the District Court err in failing to include social security and vehicle use benefits in its assessment of Cole's damages?
¶ 11 We affirm the District Court's determination that Cole was terminated without cause. However, we reverse the District Court's conclusion that a clause in the employment agreement which provided Cole with one year's salary and a bonus if he was terminated without cause was void as a liquidated damages provision. We therefore remand for further proceedings consistent with this Opinion. We do not reach VIG's remaining issues, nor do we reach Cole's cross-appeal issues.

FACTUAL AND PROCEDURAL BACKGROUND
¶ 12 In June of 1997, Martel purchased the Ice Dogs, a Junior A, American West Hockey League team. Because of the time in the season that Martel purchased the Ice Dogs, he needed to find a coach immediately. Hence, Martel met with and ultimately hired Cole as the Head Coach and General Manager of the Ice Dogs.
¶ 13 Martel asked Cole to draw up an employment agreement, which Cole did after consulting an attorney. The applicable portion of this employment agreement stated:
TERM: That the term of this Agreement shall be five (5) years, commencing on the 1st day of June 1997, and continuing thereafter, uninterrupted, unless employee is terminated for cause. In the event of the termination of employee for other than cause, employee shall receive one (1) full calendar year salary and a bonus equal to that paid to him for the preceding year.
¶ 14 The above-quoted provision of the agreement was subsequently amended in March 1998 to add the following:
Further, the term of this Agreement shall automatically renew, so as to have five (5) years remaining, each year on the 1st day of June, unless employer notifies employee in writing prior to the 1st day of May of that Year of the non-renewal.
Cole's annual base salary was fixed at $50,000.00.
¶ 15 The 1997-1998 hockey season was fairly successful, but the following 1998-1999 season was not. The Ice Dogs ended that season with a record of 18 wins, 35 losses, and 7 ties. The Ice Dogs did not qualify for the playoffs, Cole did not receive any performance bonuses, and the game attendance declined to approximately 1,000 fans per game.
¶ 16 Thereafter, during the off-season and at Cole's suggestion, Martel expended substantial sums of money in an effort to improve the team. In particular, Martel increased his recruitment efforts; entered the Ice Dogs in pre-season tournaments and in games in Canada; and hired a goalie coach and a new trainer. Despite these efforts, the 1999-2000 season again started out poorly, with the Ice Dogs winning one game and losing six.
¶ 17 On October 3, 1999, Martel terminated Cole due to the Ice Dogs' poor performance. Martel then told Cole that because he had cause to fire him, he felt he was not obligated to provide him severance pay. However, Martel did offer Cole $15,000 in severance pay, which Cole accepted. When Cole arrived to pick up his check, Martel asked him to sign a release from liability form, which Cole declined to sign. Cole then sought the advice of an attorney, and thereafter requested that Martel provide him with a written statement regarding his reasons for terminating him. Martel complied with Cole's request.
¶ 18 After receiving Martel's explanation, Cole brought an action for breach of the employment contract and for breach of the implied covenant of good faith and fair dealing. Cole filed a motion for partial summary judgment. VIG also filed a motion for summary judgment. The District Court denied VIG's motion, and it granted Cole's motion as to liability, holding, in part, that Cole was terminated without cause. Subsequently, a bench trial was held as to damages and Cole's bad faith claim.
¶ 19 Ultimately, the District Court determined that VIG did not violate the covenant of good faith and fair dealing; that the liquidated damages clause in the employment agreement was void because Cole's damages were both certain and ascertainable; that Cole's damages included lost wages and fringe benefits based on a five-year term of employment; and that the evidence concerning Cole's INS Visa status was inadmissable in that it was irrelevant, speculative, and not pled in VIG's Answer to Cole's Complaint. The District Court then calculated Cole's damages, accepting the viability of certain damage claims while rejecting others, and awarded damages to Cole in the sum of $199,193.00.
¶ 20 VIG now appeals the District Court's judgment, and Cole cross-appeals.

STANDARD OF REVIEW
¶ 21 We review a district court's findings of fact to determine whether the findings are clearly erroneous. Riverview Homes, II, Ltd. v. Canton, 2001 MT 309, ¶ 12, 307 Mont. 517, ¶ 12, 38 P.3d 848, ¶ 12. We review a district court's conclusions of law to determine whether the conclusions are correct. Riverview Homes, II, ¶ 12.

DISCUSSION
¶ 22 Did the District Court err in concluding that Cole was terminated without cause?
¶ 23 VIG contends it had good cause to terminate Cole, and that the District Court erred in concluding that Cole was discharged without cause. In this connection, it presents several arguments. First, VIG argues that under Montana law, if any uncertainty in a contract exists, that uncertainty must be construed against the drafter. As such, VIG contends that any uncertainty as to the meaning of "cause," as contained in the contract, must be construed against Cole, as he drafted the employment agreement. In addition, VIG maintains that the ordinary meaning of "cause" should apply, and that VIG had several "good or adequate" reasons for terminating Cole's employment.
¶ 24 VIG likens the present case to one brought under Montana's Wrongful Discharge from Employment Act (the WDEA). While acknowledging that the WDEA does not apply here, VIG argues that since "good cause" is defined in the WDEA, that definition provides this Court with a guideline for "cause" in the present case. Namely, the WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason[s]." Section 39-2-903(5), MCA. VIG maintains that based on this definition, we have before upheld termination for "good cause" on the basis of poor job performance and we should do so here as well.
¶ 25 As VIG notes, Cole admits he was not terminated for a capricious or false reason; in fact, he concedes his termination was the result of his losing record. Thus, there is no allegation of a pre-textual or otherwise improper motive for the discharge. VIG further maintains that firing a coach for a poor win/loss record is hardly unusual in the sports industry. Indeed, VIG contends that the expectation for Cole to win was evident by the built-in bonuses for winning listed in the employment agreement. VIG argues that it is hypercritical for Colewho drafted the employment agreementto claim he should be financially rewarded for winning, yet not penalized for a poor win/loss record.
¶ 26 Cole contends that because the plain language of the employment agreement does not list as one of Cole's duties the need to maintain a specific win/loss ratio, this Court need not analyze the contract any further, as it cannot insert terms into the contract that are not there. Hence, because the win/loss ratio was not delineated in the employment agreement, the fact that Cole was terminated because of it proves that he was not terminated "for cause." He then maintains that "[t]he fundamental issue in this case is not whether VIG had a right to discharge Coach Cole." Rather, he argues that because coaches are commonly terminated for failing to maintain a winning record, it follows that VIG is obligated to pay off the remainder of a coach's contract, as is the case here. Cole further maintains that the WDEA's definitions do not apply to the present case. Finally, he asserts that the employment agreement should not be construed against him because VIG, as the employer, was in the superior bargaining position and took unfair advantage of him.
¶ 27 The District Court found the following with regard to VIG's termination of Cole's employment:
The Agreement contained the following "Duties and Obligations" for Cole's employment: "The duties and obligations of employee include coaching, recruiting and overseeing players and staff of the Bozeman Ice Dogs franchise, together with coordination [of] the staff and programs and the Valley Gardens Ice Center, to include hockey camps and clinics, coaching clinics and hockey instruction." The Agreement did not contain an obligation to sustain a certain win/loss ratio or that he had to win a certain amount of games in a season to retain his employment.
¶ 28 We will not disturb a district court's finding of fact unless that finding is clearly erroneous. Pankratz Farms, Inc. v. Pankratz, 2004 MT 180, ¶ 44, 322 Mont. 133, ¶ 44, 95 P.3d 671, ¶ 44. A finding is clearly erroneous if: (1) substantial credible evidence does not support the finding; (2) the district court misapprehended the effect of the evidence; or (3) a mistake has been committed. Pankratz Farms, Inc., ¶ 44. Under the specific facts and contract terms presented here, we cannot conclude that the District Court's finding regarding Cole's termination was clearly erroneous. Accordingly, we affirm the District Court's finding that Cole was terminated without cause.
¶ 29 Did the District Court err in concluding that a clause in the employment agreement which provided that Cole would receive one year's salary and a bonus if he was terminated without cause was a liquidated damages clause and was therefore void?
¶ 30 The parties disagree as to whether § 28-2-721, MCA, precludes the enforcement of the provision of the parties' agreement which states that in the event of a termination without cause, Cole will receive a full calendar year's salary together with a bonus equal to that paid in the preceding year. See ¶ 13. Cole argues that this provision is a liquidated damages clause and is thus unenforceable under § 28-2-721, MCA. The District Court agreed with Cole.
¶ 31 VIG argues that either § 28-2-721, MCA, does not apply here at all, or that, if it does, Cole must prove the provision of the agreement unconscionable under our decision in Arrowhead Sch. Dist. # 75, Park Co. v. Klyap, 2003 MT 294, 318 Mont. 103, 79 P.3d 250. VIG maintains that because the clause was drafted by Colea fact not in disputehe cannot prove the clause's unconscionability, and that, therefore, the provision is enforceable.
¶ 32 Section 28-2-721, MCA, provides:
(1) Every contract by which the amount of damage to be paid or other compensation to be made for a breach of an obligation is determined in anticipation thereof is to that extent void, except as expressly provided in subsection (2).
(2) The parties to a contract may agree therein upon an amount which shall be presumed to be an amount of damage sustained by a breach thereof when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.
¶ 33 The District Court concluded that the clause in question was void because Cole's damages were in fact both certain and ascertainable; thus, the exception set forth in § 28-2-721(2), MCA, was inapplicable. The District Court then proceeded to award to Cole damages including lost wages and fringe benefits based on a full five-year term of employment. We conclude that because Cole waived the benefit of the liquidated damages law by virtue of the contract provisions he drafted, the District Court erred in applying the provisions of the liquidated damages statute to the contract before us.
¶ 34 Section 1-3-204, MCA, provides:
Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.
We have had recent occasion to address the application of this statute. In Rothwell v. Allstate Ins. Co., 1999 MT 50, 293 Mont. 393, 976 P.2d 512, we were called upon to determine whether the provisions of § 39-2-701(1), MCA, which required an employer to indemnify an employee for money she expended in the discharge of her duties of employment, could be waived by the provisions of an employer's standard written contract of employment. The employer argued that § 1-3-204, MCA, permitted the employee who signed the contract agreeing to accept less than full indemnification for employment-related expenses, to waive the benefits of the indemnification statute. This Court disagreed, concluding that, should the employer's argument prevail, then the "waiver of the right to indemnification would result in the forfeiture of a valuable right granted to all Montana employees." Rothwell, ¶ 12. In reaching this decision, we cited with approval other employment-related cases in which we determined that employees could not, by signing contracts drafted by their employers, bargain away their statutory rights. See, State ex rel. Neiss v. District Ct. of Thirteenth J.D. (1973), 162 Mont. 324, 511 P.2d 979 (employees may not bargain away their right to receive minimum wage), and Hoehne v. Sherrodd, Inc. (1983), 205 Mont. 365, 668 P.2d 232 (laws establishing an employee's right to receive overtime compensation are expressions of public policy created for the protection and benefit of the general public and thus may not be waived by agreement). We concluded in these cases that employees' statutory rights to minimum wage and overtime payments were rights that were established for a public reason and could therefore not be waived by private agreement. Against this backdrop, we now analyze § 28-2-721, MCA, and its applicability to the unique circumstances presented here.
¶ 35 Section 28-2-721, MCA, applies in general to contracts entered into between bargaining parties; it does not fall within the Code's chapters governing employment-related benefits as did the overtime and indemnification statutes addressed in Rothwell. Moreover, the existence of § 28-2-721(2), MCA, in the statutory scheme supports the proposition that it is a law whose provisions are intended for the benefit ofand therefore may be waived by contracting parties. In other words, the fact that § 28-2-721(2), MCA, allows by its provisions the waiver of the benefit of the statute, demonstrates that it is not a law established for a public reason, because such laws cannot be contravened by private agreement. Section 1-3-204, MCA.
¶ 36 Here, it is Cole, as the party claiming damages, to whose benefit the provisions of the liquidated damages statute would normally run. However, it was Cole who drafted the employment agreement and inserted into it the clause providing that, should he be terminated for "other than cause," he would receive a full year's salary together with a bonus equal to that paid to him the previous year. And it is Cole who argued successfully to the District Court that he was fired for "other than cause," thus triggering the provisions of the salary clause he drafted. In sum, by virtue of the provisions he inserted into the contract, Cole effectively waived the advantage of a law intended for his benefit, as is his right under § 1-3-204, MCA. Therefore, we conclude that Cole waived the advantage of the liquidated damages law by inserting into the contract between him and VIG the provision requiring payment to him of a full year's salary and bonus in the event he was terminated without cause.
¶ 37 The decision we reach here is only fair. It is incongruous for Cole to seek on the one hand to enforce one provision of the contract he drafted and at the same time distance himself from another provision that he now concludes in hindsight is less than lucrative. If, as Cole successfully argued, the plain language of the contract compels a conclusion that he was terminated without cause, see ¶ 26, than the plain language of the clause he drafted setting forth the compensation to be paid under that very circumstance should govern as well.
¶ 38 Accordingly, we affirm the District Court's conclusion that Cole was fired without cause. We reverse the District Court's conclusion that Cole is entitled to five years worth of salary and benefits, and remand for an award of damages to Cole in the amount of one full calendar year's salary, together with a bonus equal to that paid to him in the preceding year, all as more particularly set forth in the provisions of his employment agreement.
¶ 39 Reversed and remanded.
JUSTICES JAMES C. NELSON, JOHN WARNER, and BRIAN MORRIS, Concur.
Justice Jim Rice dissenting.
¶ 40
I dragged myself off the field, wanting to get out of everybody's sight. Our record for the season was 1-7. The pressure I felt was almost unbearable. We had lost five games in a row. I wanted to hide, but it was impossible. Like a boxer, I could run, but I couldn't hide. I had to face the music. I had to face the players. I had to face the media. And I had to face Art Modell.
. . . .
I knew it was very difficult for Art. But it was his football team, and his was the only game in town. Professional football is a business, big business. It's easy to say that, but when a coach gets firedespecially when he's had a close relationship with the ownerit's not easy to accept. Even though Art had probably consulted many of his associates, it was his unpleasant task to break the news to me. You can be friends only so long as you win. I guess I forgot that. We had lost to Cincinnati, and that was the last straw. My Armageddon with the Cleveland Browns had finally arrived. I should have remembered that hirings and firings are simply part of professional sports.
Pressure, Sam Rutigliano, Oliver-Nelson Books, 1988, pp. 10, 17.
¶ 41 I dissent. The Court has engaged in an incorrect review of this summary judgment matter and applied an incorrect contract analysis, leading to erroneous interpretation of the employment contract at issue.
¶ 42 The Court states that it is reviewing the District Court's findings of fact to determine whether they are clearly erroneous, and, thus, will not "disturb" the findings unless unsupported by substantial evidence or the District Court has misapprehended the evidence or has made a mistake. See ¶¶ 21 and 28. The Court then explains that the District Court "found" that the employment agreement did not include a provision requiring Coach Cole "to sustain a certain win/loss ratio," and concludes therefrom that:
[W]e cannot conclude that the District Court's finding regarding Cole's termination was clearly erroneous. Accordingly, we affirm the District Court's finding that Cole was terminated without cause.
¶ 28 (emphasis added).
¶ 43 This is an appeal from the entry of summary judgment, not from a trial in which the District Court considered witness testimony, weighed conflicting evidence and made findings of fact therefrom. The proper review here is de novo, that is, whether there are genuine issues of material fact, and, if not, whether either party is entitled to judgment as a matter of law. As we have previously explained in other wrongful discharge cases:
Our standard in reviewing a district court's summary judgment ruling is de novo; we use the same Rule 56, M.R.Civ.P., criteria as the district court. Clark v. Eagle Systems, Inc. (1996), 279 Mont. 279, 283, 927 P.2d 995, 997 (citations omitted). The party seeking summary judgment must establish both the absence of any genuine issue of material fact which would allow the nonmoving party to recover and entitlement to judgment as a matter of law. Rule 56(c), M.R.Civ.P.; Clark, 927 P.2d at 997-98 (citations omitted).In this case, MacMillan does not argue that there are genuine issues of material fact precluding summary judgment, but only that the District Court erred in concluding that the State Fund was entitled to summary judgment as a matter of law. We review a district court's conclusions of law to determine whether those conclusions are correct. Albright v. State, by and Through State (1997), 281 Mont. 196, 933 P.2d 815, 821 (citation omitted).
MacMillan v. State Compensation Ins. Fund (1997), 285 Mont. 202, 204, 947 P.2d 75, 76; see also Morton v. M-W-M, Inc. (1994), 263 Mont. 245, 249, 868 P.2d 576, 578-79 (entry of summary judgment in wrongful discharge case). Thus, the issue here is not whether the District Court's findings of fact are supported by substantial evidence, but whether there are factual conflicts which would preclude summary judgment, and if not, whether summary judgment is appropriate as a matter of law.
¶ 44 The District Court did not identify any issues of material fact; nor do the parties identify such factual issues in their arguments. Although labeled as "findings of fact," the District Court "made" no such findings, but, rather, simply set forth those facts which were uncontested. Thus, there being no issues of material fact, our duty on appeal is to determine whether the District Court's conclusion of lawthat VIG's termination of Coach Cole's employment was a violation of the employment contractis correct. See Basto v. Crago, Inc. (1996), 280 Mont. 408, 411, 930 P.2d 78, 80.
¶ 45 "The construction and interpretation of a contract is a question of law for the court to decide." Schwend v. Schwend, 1999 MT 194, ¶ 36, 295 Mont. 384, ¶ 36, 983 P.2d 988, ¶ 36 (citing Stutzman v. Safeco Ins. Co. of America (1997), 284 Mont. 372, 376, 945 P.2d 32, 34).
The law thus imposes on us the duty of interpreting, as a matter of law, the employment agreement entered by the parties.
¶ 46 The District Court concluded that because "[t]he condition to have a winning percentage or an adequate win/loss record ratio was not in the contract . . . the Plaintiff's termination was without `cause.'" The District Court noted that the contract included "coaching" as a duty, but, stating there were no Montana cases addressing the termination of a coach's employment for a poor won-loss record, reasoned therefrom that permitting the termination of Cole's employment for this reason would require the insertion of "language into the contract which was not agreed upon by the parties." Thus, according to the District Court, because (1) there are no previous cases on point, and (2) "cause" is not defined by the contract, then (3) poor team performance cannot be "cause" for termination of employment, despite Cole's contractual duty of "coaching."
¶ 47 Although the District Court may have believed it was avoiding the insertion of language into the contract, what it actually did was substantially eliminate an agreed-to provision of the contract: that Cole was subject to termination for "cause." Cole's failure to define "cause" when drafting the agreement does not mean that the term has no meaning, or that the parties only intended the term to have a narrow, specific meaning. To the contrary, the undefined term is open to various interpretations. It takes but a moment to imagine an egregious or negligent employment-related act by a professional coach which would, of necessity, constitute cause for terminationyet, which would not satisfy the District Court's interpretation of "cause" because the act is not specified by the contract. This illustrates the broader meaning of "cause" in the sports employment context, and, further, demonstrates our duty to interpret the term under this set of circumstances, particularly in light of Cole's failure to define the term when he drafted the agreement. Indeed, we have previously undertaken this task.
¶ 48 VIG offers a number of cases we have decided pursuant to the Wrongful Discharge from Employment Act (WDEA), which defines good cause as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties . . . or other legitimate business reason." Section 39-2-903(5), MCA. Acknowledging that this is not a WDEA case, VIG nonetheless offers these cases as a "guideline" for this matter. While the Court notes this argument, it takes no position on the offered authority. In any event, we have already taken up this issue, both in the context of WDEA cases and non-WDEA cases:
"It is well settled in our pre-[wrongful discharge] Act cases that courts should not intrude in the day-to-day employment decisions of business owners. . . . An employer's legitimate right to exercise discretion over whom it will employ must be balanced, however, against the employee's equally legitimate right to secure employment. . . . The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business."
Morton, 263 Mont. at 250, 868 P.2d at 579 (emphasis added) (alteration in original) (quoting Kestell v. Heritage Health Care Corp. (1993), 259 Mont. 518, 525, 858 P.2d 3, 7-8). We further explained in Kestell that we had defined "legitimate business reason" as "a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." Kestell, 259 Mont. at 525, 858 P.2d at 7 (quotingBuck v. Billings Montana Chevrolet, Inc. (1991), 248 Mont. 276, 281-82, 811 P.2d 537, 540).
¶ 49 Similar standards have been applied in other jurisdictions for similar situations, including the discharge of a coach employed pursuant to a contract which allowed discharge only for good cause:
The term "good cause" is "largely relative in [its] connotation, depending upon the particular circumstances of each case."" Essentially, [it] connote[s] `a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' [Citation.]" The employer does not have a right to make an arbitrary or unreasonable decision about terminating an employee when there is an agreement to terminate only for good cause.
Wood v. Loyola Marymount University (1990), 218 Cal.App.3d 661, 670, 267 Cal.Rptr. 230, 235 (citations omitted) (alterations in original) (addressing discharge of University's head baseball coach).
¶ 50 The record here discloses uncontested facts, some of which are overlooked by the Court, to which these established standards can be applied. Although referred to collectively as VIG, the appellants include William Martel. Martel operated a construction company and came into ownership of the Bozeman Ice Dogs after the original investor group who owned the team and was building the Valley Ice Garden could not pay its obligations. Martel, who had never seen a professional hockey game before, asked Cole to coach the team and further asked him to prepare an employment agreement. Cole's attorney drafted the agreement and Martel signed it without further negotiation.
¶ 51 The 1997-1998 season, featuring players recruited by the previous management, was successful. However, the 1998-1999 season, featuring players recruited by Cole, was dismal, with the Ice Dogs winning 18, losing 35 and tying 7. The team failed to make the playoffs and thus lost post-season revenues. The poor performance led to a drop in game attendance by about 1,000 people per game, reducing regular season revenues. At Cole's urging, VIG invested substantial sums of money in the off-season to turn the team's fortunes around. Cole traveled extensively to recruit better players, the team traveled and competed in pre-season tournaments and VIG hired a goalie coach who would also run a youth hockey program. Cole told Martel that the team would be competitive and would "dominate."
¶ 52 The team then played poorly and lost the first two games of the season, one to a significantly underfunded team. Martel called Cole to a meeting and asked the reason for the Ice Dogs' poor performance. Cole replied that he had no explanation. The Ice Dogs continued losing thereafter at a rate that exceeded the previous season. After going 1-6 in the first seven games, and the team having the fewest number of goals scored in the league, Martel terminated Cole.
¶ 53 Cole acknowledged that the "measuring stick" of a team's performance is the team's record, and that the win-loss record is a "big factor" in assessing a coach's performance. He further acknowledged that a team's success is dependent on having a competitive team that will attract fans to watch the games. He even admitted that Martel had the right to terminate him, but argues he is entitled to have his contract paid off because "cause" does not include poor performance.
¶ 54 However, Cole's argument does not reflect the law. It is undisputed that the Ice Dogs were performing poorly under Cole's coaching. With the players he had recruited, and despite the enhanced program VIG had financed at Cole's request, the team was not succeeding and not drawing fans to the games. Cole did not establish, nor even assert, that these reasons for terminating his employment "were false, arbitrary or capricious, [or] unrelated to the needs of the business." Morton, 263 Mont. at 250, 868 P.2d at 579. Neither did he establish, nor even assert, that VIG's reasons were "false, whimsical . . . [or did not] have some logical relationship to the needs of the business." Kestell, 259 Mont. at 525, 858 P.2d at 7. As we have defined the term in both WDEA and non-WDEA cases, VIG had a "legitimate business reason" to terminate Cole, a reason "logically related to the needs of the business." Discharging the coach of a professional sports team which is performing poorly, despite management's good faith efforts, is a discretionary decision related to the legitimate needs of the business and constitutes "cause."
¶ 55 Further, Cole drafted the agreement, and any ambiguity must be construed against him. I would conclude that the termination of Cole's employment was for "cause" under the agreement, and would reverse the District Court.
Chief Justice Karla M. Gray and Justice W. William Leaphart join in the dissent of Justice Rice.